Rockingham
No. 91-453

RICHARD FITZ

v.

JOHN COUTINHO

March 11, 1993

*James A. Connor*, of Manchester, by brief and orally, for the plaintiff.

*Cullity, Kelley and McDowell*, of Manchester (*Joseph F. McDowell, III* on the brief and orally), for the defendant.

JOHNSON, J.    This appeal arises from an action for breach of contract brought by the plaintiff, Richard Fitz, a timber buyer, against the defendant, John Coutinho, owner of a 150-acre wooded lot. The Superior Court (*Gray*, J.) found that Coutinho breached a contract authorizing Fitz to enter and remove certain trees from Coutinho's

lot. The trial court awarded Fitz the total amount of lost profits he could have realized on resale of saw timber and firewood from the lot, and allowed Coutinho to recoup an amount for the timber that Fitz removed from the lot and sold. We affirm the trial court's decision on Coutinho's liability for the breach, but vacate the lost profits assessment and remand for an award of nominal damages because Fitz failed to present reasonably certain proof of the amount of lost profits.

At the time of the contract, Fitz was in the lumber and firewood business. He contracted with landowners to buy stumpage, which is the value of standing trees, for sale of firewood to the public and saw timber to sawmills, and generally hired subcontractors who would supply employees and equipment to remove timber in exchange for part of the proceeds from resale.

Coutinho negotiated with Fitz for removal of certain timber from his 150-acre lot. Fitz and Coutinho walked the lot for about three hours and entered into a written agreement on April 19, 1986, selling Fitz all merchantable standing hardwood and softwood of a certain size and permitting Fitz to enter the property to cut the timber. The contract provided that Fitz would remove timber "in a workman-like manner," and that Coutinho would receive specified dollar amounts on a weekly basis per cord of firewood and per thousand board feet of different species of softwood and hardwood logs and veneer. Fitz testified that his practice was to base payments on the amount of board feet calculated by the measuring, or scaling, of logs by a sawmill receiving a shipment. *See generally* H. FALK, TIMBER AND FOREST PRODUCTS LAW § 184, at 138 (1958). Fitz hired David Parker, a logging subcontractor, to harvest the timber and to arrange for shipments to sawmills.

The relationship between Coutinho and Fitz soured by early May 1986. Fitz made no payments in the two full weeks that passed after the contract was signed, and Coutinho believed Fitz and his subcontractors were cutting types and quantities of timber beyond that contemplated by the agreement. On May 7, 1986, Fitz and Parker left the property after the police approached Parker at Coutinho's request, after Parker's equipment had been vandalized, and after Fitz received notice from Coutinho's lawyer ordering him to leave. Although Parker testified that he removed about 25,000 board feet—about four and a half truckloads—during the seven to ten days he worked on Coutinho's land, Fitz paid Coutinho on May 7 only for the one load that had been scaled by a mill.

The trial court heard testimony on the breach of contract and lost profits claims from the parties, Parker, and Charles Moreno, a professional forester who inspected the property and found slash remaining after Fitz's departure. The trial court refused to find that Fitz materially breached the contract, but found that Coutinho had breached by ordering Fitz to leave. The trial court calculated total lost profits of $62,775 and deducted $2,500 as a recoupment due Coutinho for timber Fitz harvested under the contract.

On appeal, Coutinho argues that the trial court erroneously found that he breached the contract first. Coutinho asserts that Fitz's substandard work practices and failure to make weekly payments were earlier material breaches that excused Coutinho's nonperformance of the duty to allow the loggers access to the land. Coutinho also argues that the award of lost profits is legally erroneous because Fitz failed to present reasonably certain proof of the amount. Neither party seeks review of the recoupment.

■ ■ The trial court refused to find that Fitz materially breached the provision requiring "workman-like" performance. The trial court is in the best position to evaluate the evidence, and we will not reverse a finding on whether a party performed in a substandard manner, unless the finding lacks support in the record. *See State v. Westcott*, 134 N.H. 692, 695, 597 A.2d 1072, 1075 (1991); *Bishop v. Martineau Plumbing & Heating Co.*, 117 N.H. 524, 524, 375 A.2d 594, 594 (1977). The evidence on whether the loggers were performing shoddy work was conflicting. Moreno testified that industry practice is to remove slash and merchantable timber simultaneously, and that debris remained on Coutinho's land and in a streambed after Fitz's departure. Parker testified that his practice was to remove slash after logging opens up the woodlot, and Fitz and Parker testified that they were ordered off the land before they could clean it up. Such conflicts in the evidence on the quality of performance are for the trial court to resolve. *Bishop*, 117 N.H. at 524, 375 A.2d at 594. Under these circumstances, we find no error in the trial court's determination that Fitz did not breach the provision.

We next address whether the trial court erred in refusing to find that Fitz materially breached the contract by not tendering payments during the more than two weeks that elapsed before Coutinho ordered him off the land. A provision of the contract signed on April 19 required payments on a "weekly basis," but Fitz did not make a payment until May 7.

■ ■ Not every breach of duty by one party to a contract discharges the duty of performance of the other. *See* 6 A. CORBIN, COR-

BIN ON CONTRACTS § 1253, at 9–10 (1962). Only a breach that is sufficiently material and important to justify ending the whole transaction is a total breach that discharges the injured party's duties. 4 CORBIN, *supra* § 946, at 809–10 (1951). Whether a delay in payments is a material breach is a question for the trier of fact to determine from the facts and circumstances of the case. *See Sawin v. Carr*, 114 N.H. 462, 466, 323 A.2d 924, 927 (1974); RESTATEMENT (SECOND) OF CONTRACTS § 241 & comment a at 237 (1981).

We find no error in the trial court's decision that Fitz's failure to tender payments on a weekly schedule was not a material breach. *See* 6 CORBIN, *supra* § 1253, at 11–12 & n.8. The question whether a breach discharges the injured party's remaining duties "is a different form of the question whether a breach goes 'to the essence' or not." 4 CORBIN, *supra* § 946, at 810 n.5. Time is generally not of the essence in a contract, unless the contract specifically so states, even if a particular time schedule is specified. *See C & M Realty Trust v. Wiedenkeller*, 133 N.H. 470, 475, 578 A.2d 354, 357 (1990); *Sawin*, 114 N.H. at 466, 323 A.2d at 927. The evidence suggests that Coutinho learned from a prior dealing with Fitz that a delay in payment could occur until a mill returns a record of the scale of the timber, and nothing in the record requires a finding that the parties agreed to make adherence to the payment schedule essential. We hold, therefore, that the trial court did not err in refusing to find that Fitz materially breached the contract. Because Fitz did not materially breach the contract, Coutinho's nonperformance was not excused.

Holding Coutinho liable for breaching the contract, we consider whether Fitz carried his burden of proving the fact and amount of damages. *See Whitehouse v. Rytman*, 122 N.H. 777, 780, 451 A.2d 370, 372 (1982). We view the evidence on damages in the light most favorable to the prevailing party. *See id.*

Fitz has not argued, and no facts suggest, that he suffered any damages other than lost profits. A plaintiff seeking lost profits must prove by a preponderance of the evidence that the claimed profits were reasonably certain in the absence of the breach. *See Hydraform Prods. Corp. v. American Steel & Alum. Corp.*, 127 N.H. 187, 197, 498 A.2d 339, 345 (1985); *Salinger v. Salinger*, 69 N.H. 589, 591, 45 A. 558, 559 (1899). Although we have stated that "speculative losses" are not recoverable, *see Hydraform Prods. Corp.*, 127 N.H. at 197, 498 A.2d at 345, we recognize that the term "'speculative and

uncertain profits' is not really a classification of profits, but is instead a characterization of the evidence that is introduced to prove that they would have been made" if the defendant had not breached the contract. 5 CORBIN, *supra* § 1022, at 139 (1964).

The record contains abundant evidence that Fitz lost an indeterminate amount of profits because of Coutinho's breach. A market for saw timber and firewood exists. The lot was heavily wooded. Fitz made a profit from his subcontractor's brief tenure on the lot. A logical inference is that he would have continued to profit from further cutting of standing timber under the contract. We conclude that Fitz produced reasonably certain proof that he lost profits as a result of Coutinho's breach.

■ In addition to proving the *fact* of lost profits, the plaintiff must establish the *amount* with reasonable certainty. *See* C. MCCORMICK, HANDBOOK ON THE LAW OF DAMAGES § 26, at 99 (1935). Any measure of Fitz's anticipated profits for removing saw timber from the lot would include the volume of standing timber-quality trees of each species multiplied by the market price for veneer or saw logs of each species, less the cost of sharing the proceeds with subcontractors and paying amounts due the landowner under the contract. An important variable in determining the market price is the "grade," or quality of the saw timber, which can vary widely. *See generally* FALK, *supra* § 185, at 140–41. Factors relevant to calculating profits for firewood are similar, with a further deduction for the cost of splitting, stacking, and transporting the firewood for sale to the public.

■ The defendant's challenge to the proof of damages is that the plaintiff failed to present adequate evidence of the volume and grade of timber on the lot to allow a reasonably certain calculation of lost profits. Opinion testimony on lost profits must be based on "sufficient relevant data" so that it enables the trier to resolve uncertainties. *See Restaurant Operators, Inc. v. Jenney*, 128 N.H. 708, 712–13, 519 A.2d 256, 259–60 (1986) (quotation omitted). Fitz calculated the volume of firewood, pine, hemlock, and hardwood veneer and saw logs standing on the lot, based on: (1) his experience in assessing the yield of woodlots; (2) an estimate that an acre yields 34 cords of wood (substantially exceeding Moreno's estimate of 16 to 20 cords per acre); and (3) recollections of observations he made during a three-hour walk across the 150-acre property before he entered into the contract. Parker corroborated Fitz's figures, based on: (1) his own surveillance of the property to determine whether he could earn at least $500 to cover the cost of moving his equipment to the site; (2)

his observations made while working on the lot; and (3) his knowledge that he had cut approximately eight to ten truckloads of timber in seven to ten days and that "the rest of the wood was still there." Fitz and Parker made no contemporaneous notes of their observations, and no further survey of the woodlot occurred in the five years preceding trial.

Fitz and Parker drew their estimates of the volume of timber on the lot from walk-through appraisals designed to determine whether they could profit from entering into a contract. Provided that their original estimates were accurate enough to ensure their costs would not exceed gross returns from sales of timber and firewood, Fitz and Parker could over- or underestimate the volume of timber on the lot without detrimental consequences. The figures they presented at trial were based on their five-year-old observations. Despite the liberal rules of discovery that permit a party to seek permission to enter upon land owned by another for further inspections, Fitz never returned to the site to verify his calculations or to determine the grade of the standing timber. *See* SUPER. CT. R. 35(a); *Robbins v. Kalwall Corp.*, 120 N.H. 451, 453, 417 A.2d 4, 5 (1980). The best evidence of the unreliability of the estimate of Fitz is that two weeks after he left the project he executed a petition to attach the defendant's property and swore that 250 cords of firewood would have been harvested. At trial he testified under oath that 850 cords of firewood would have been harvested had he completed the project.

Moreno, the defendant's expert, testified that estimates of the volume of standing timber based on walk-through appraisals can vary widely, but that a "forest cruise," a statistical method for estimating the volume of timber on a lot, *see generally* FALK, *supra* §§ 181–83, at 133–38, yields relatively accurate results. We conclude that data from mere walk-through appraisals of a woodlot and from estimates of the normal yield of a 150-acre lot provide an insufficient basis for grounding a *reasonably certain* conclusion of the lost profits for a timber contract. *See Hydraform Prods. Corp.*, 127 N.H. at 199, 498 A.2d at 346.

The plaintiff argues that "uncertainty as to the amount is no reason for disallowing recovery when the uncertainty is caused by the defendant's unexcused breach." *Van Hooijdonk v. Langley*, 111 N.H. 32, 35, 274 A.2d 798, 800 (1971) (quotation and brackets omitted); *see also Story Parchment Co. v. Paterson Co.*, 282 U.S. 555, 563–66 (1931). In this case, however, the uncertainty that is fatal to the trial court's lost profits award did not result from Coutinho's breach. Instead, the uncertainty resulted from the production of insufficient

data under the circumstances for the trier of fact to reach a reasonably certain conclusion on the volume and grade of standing timber on the lot and, consequently, on the amount of lost profits. *See Hydraform Prods. Corp.*, 127 N.H. at 199, 498 A.2d at 346. We conclude that the trier's award of lost profits based on the volume of standing timber was in error, and we accordingly vacate the award. *See, e.g., Great Lakes Aircraft Co. v. City of Claremont*, 135 N.H. 270, 297, 608 A.2d 840, 857 (1992) (vacating damages to extent that award included lost profits); *Hydraform Prods. Corp.*, 127 N.H. at 200–202, 498 A.2d at 347–48 (authorizing remittitur to amount of contract damages exclusive of lost profits).

■ Although the record lacks reasonably certain proof of the volume and grade of standing timber and the total amount of gains that Coutinho's breach prevented, the evidence supports a finding that Fitz lost an indeterminate amount of profits. An award of nominal damages is appropriate in this case. *See Pugliese v. Town of Northwood*, 119 N.H. 743, 751, 408 A.2d 113, 118 (1979).

For the foregoing reasons, we allow the recoupment, but vacate the award of lost profits and remand for an assessment of nominal damages.

*Affirmed in part; damages vacated; and remanded.*

All concurred.