Carroll
No. 92-306

### INDEPENDENT MECHANICAL CONTRACTORS, INC.

v.

### GORDON T. BURKE & SONS, INC.

December 23, 1993

*Hastings Law Office, P.A.*, of Fryeburg, Maine (*Peter G. Hastings* on the brief and orally), for the plaintiff.

*McLane, Graf, Raulerson & Middleton, P.A.*, of Manchester (*Arthur G. Greene* and *Ellen L. Arnold* on the brief, and *Mr. Greene* orally), for the defendant.

JOHNSON, J. The defendant, Gordon T. Burke & Sons, Inc. (Burke), a general contractor, appeals from a jury's award of damages in Superior Court (*Mohl*, J.) to the plaintiff, Independent Mechanical Contractors, Inc. (IMC), for breach of contract and defamation. We affirm the award for breach of contract because IMC's injuries were a reasonably foreseeable consequence of Burke's breach and because lost profits were proved with reasonable certainty. We reverse the verdict against Burke for defamation.

On April 11, 1980, the Bartlett School District engaged Burke as a general contractor at a cost of almost $900,000 to make additions and alterations to the Josiah Bartlett Elementary School. Burke subcontracted the project's plumbing, heating, and ventilation requirements to IMC. The contract between IMC and Burke targeted December 1, 1980, for completion and required Burke to supervise the project to prevent conflicts and delays. Burke, however, never devised a schedule allotting time for the work of the different trades on the job. Delays caused by other trades stalled IMC's progress for approximately one month during the summer of 1980 and compressed the already short period for its work. Despite this delay, IMC substantially completed its work and received "punch list" assignments from Burke in the early spring of 1981. IMC notified Burke that certain items on the punch list were not within the scope of its contract. Burke nonetheless ordered IMC to work on the items. IMC refused, and school district officials ordered IMC off the site in February 1982. The record supports an inference that the officials acted according to Burke's direction.

Litigation between the parties began in June 1981, when Burke filed a petition for declaratory judgment. IMC filed counterclaims

seeking damages for loss of reputation, lost profits, and other economic hardships allegedly caused by Burke's breach of the contractual duty of supervision and by Burke's defamation of IMC. The trial court denied Burke's motion to dismiss, and a jury awarded IMC $100,000 for breach of contract and $150,000 for defamation. The trial court denied Burke's motions to set aside the verdict, for judgment notwithstanding the verdict, and for remittitur. Burke appealed.

## I. Breach of Contract

Burke does not deny that a breach occurred but contends there was insufficient proof that the breach was a proximate cause of IMC's injuries, or that these injuries were reasonably foreseeable. Because the test of proximate cause *is* foreseeability, 5 A. CORBIN, CONTRACTS § 1006, at 70 (1964), we address these two contentions together. Burke also argues that IMC's proof of lost profits was speculative. We view the evidence in a light most favorable to IMC and affirm the jury's verdict if there is sufficient evidence in the record to support it. *See Petrie-Clemons v. Butterfield*, 122 N.H. 120, 124, 441 A.2d 1167, 1170 (1982).

The breach for which the jury awarded damages was Burke's failure to supervise the project. The construction project manual, which was incorporated into the parties' contract, provided that Burke "shall coordinate and supervise the work performed by Subcontractors to the end that the work is carried out without conflict between trades and so that no trade, at any time, causes delay to the general progress of the work." A reasonable jury could find a breach of this provision in Burke's failure to schedule the job and to coordinate the work of different trades, resulting in a month-long delay during the summer of 1980. A reasonable jury could also determine that Burke misassigned punch list items to IMC and that this misassignment was a breach of Burke's duty of supervision.

At trial, IMC alleged that this breach caused it injuries, including loss of reputation, lost profits, and other economic harms. According to IMC, the delay during the summer of 1980 forced it to lay off employees. Moreover, IMC argued, it suffered a loss of reputation and a sudden drop in income coinciding with its involvement in the Bartlett school project. Finally, IMC stated that it subsequently lost its ability to obtain a line of credit and bonding, and failed to garner certain jobs, although its bids were competitive.

■■ We first address whether there is a sufficient causal connection between Burke's breach and IMC's injuries to warrant holding Burke responsible for them; that is, whether IMC's losses were a reasonably foreseeable consequence of the breach. *See* 5 CORBIN, *supra* §§ 997–98, 1006–07. Damages are available only if the harm was a reasonably foreseeable result at the time the parties entered into the contract. *See Salem Engineering & Const. Corp. v. Londonderry School Dist.*, 122 N.H. 379, 383, 445 A.2d 1091, 1094 (1982). One way a plaintiff may satisfy this requirement is by specifically proving that the defendant "had reason to know the facts" at the time the parties contracted and to foresee that the injury would be a probable consequence of a breach. *Petrie-Clemons v. Butterfield*, 122 N.H. at 124, 441 A.2d at 1170 (quotation omitted). IMC satisfied this test.

We observe that when Burke engaged IMC in April 1980, construction work was scarce. The Bartlett school project promised to be high-profile work, especially because its progress would be discussed at local school board meetings. IMC, a family-run business, had been in business for less than a year. A jury could infer Burke was familiar with IMC's size and brief history at the time of contracting because Burke had previously worked with the father of IMC's principals and because a bidder's references, history, and qualifications are generally reviewed before a bid is accepted. Moreover, Burke should have known that an outsider might assume the punch list items were correctly assigned to IMC, thus making IMC's refusal to complete those items look like an unwillingness to perform its duties. Considering all these factors, we conclude that the record supports a finding that Burke had reason to foresee that misassigning punch list items would probably harm IMC's reputation and economic prospects.

Similarly, the record reveals a significant causal connection between Burke's failure to coordinate the work of trades on the project and IMC's diminished profits. Given the paucity of construction work at the time of contracting and the relatively tight time schedule Burke demanded of IMC, it was likely that such a failure to supervise the project adequately would delay IMC's work, thus damaging its reputation, thereby lowering its profits. The evidence sustains a finding that Burke had reason to foresee that IMC's injuries would be a probable consequence of its breach.

These facts differ materially from those influencing our decision in *Salem Engineering*, on which Burke heavily relies. We reversed an

award of consequential damages in that case in part because the defendant could not have reasonably foreseen at the time of contracting that the plaintiff general contractor would suffer a loss of reputation and a deterioration in its ability to remain a going concern if a fraction of the contract price were wrongfully withheld. *Salem Engineering*, 122 N.H. at 384, 445 A.2d at 1094. The contractor's business had existed for years, employed forty to fifty people, had a value of approximately three million dollars, and had obtained projects worth more than five million dollars. *Id.* at 384, 445 A.2d at 1094. That contractor, unlike IMC, thus appeared well-established and immune from the losses alleged. In this case, the evidence indicates that Burke had reason to know of IMC's vulnerability.

■ Burke apparently argues that its breach did not justify the jury's award of damages because other events may have contributed to IMC's injuries. While we recognize the plausibility of Burke's premise, we point out that no one event is the sole cause of another. "In all cases involving problems of causation and responsibility for harm, a good many factors have united in producing the result . . . ." 5 CORBIN, *supra* § 999, at 24. "In order to establish liability the plaintiff must [merely] show that the defendant's breach was 'a substantial factor' in causing the injury." 5 CORBIN, *supra* § 999, at 25. IMC has done this. After carefully reviewing the transcripts and exhibits, we find no merit in Burke's suggestion that the jury's finding lacked a sufficient evidentiary basis.

■ We next consider whether the record contains reasonably certain proof of IMC's lost profits to support the jury's award of $100,000 for the breach of contract. "While the law does not require absolute certainty for recovery of damages, we will uphold an award of damages for lost profits only if sufficient relevant data support[] a finding that profits were reasonably certain to result" in the absence of the breach. *Great Lakes Aircraft Co. v. City of Claremont*, 135 N.H. 270, 296, 608 A.2d 840, 857 (1992) (citation omitted).

IMC's evidence on lost profits consisted of the expert testimony of Arthur Kenison. Kenison, an economics professor experienced in evaluating future profits, explained that he used a standard methodology to project IMC's lost profits from 1980 through 1985. He took into account IMC's revenues and operating costs for labor, materials, and subcontractors during the company's first year. His figures, drawn from cash revenue and expense reports, reveal that IMC had profits for its first year of operation, May 1979 through April

116

1980, of $2,839, while its profits for the first four months of 1980 were $4,930. The evidence supports his assumption that IMC's accounts were in balance in early 1980. Kenison chose to "annualize" IMC's profits for the period from January through April 1980, to create a hypothetical net "income potential" for 1980 equal to $14,790, because he assumed that the losses from May to December 1979 reflected low start-up volume and did not represent the company's earning capacity. We are not persuaded by Burke's argument that choosing the *calendar* year 1980 as a base period would have yielded more reliable results, especially because the evidence suggests that Burke's breach caused a delay during the summer of 1980 and affected IMC's profits during that time.

Comparing IMC's net "income potential" of $14,790 with its actual profits according to its tax returns, Kenison calculated IMC's total lost profits for 1980 through 1985 at $203,680. He also testified that IMC's total lost profits would equal $230,036, if the rate of growth in construction industry employment throughout the State from 1980 through 1985 were factored in. Kenison further testified that his projections of lost profits would rise to $332,337 if IMC had invested its lost profits annually in three-month treasury bills through 1986.

■ Burke argues that testimony of interest-inflated lost profits was improper and confusing to the jury. Because Burke failed to make a specific, contemporaneous objection to the admission of this testimony, our review of this issue is restricted to whether its admission rendered the evidence on lost profits uncertain. *Cf. State v. Ryan*, 135 N.H. 587, 588, 607 A.2d 954, 955 (1992). The evidence indicates that Kenison included information on interest rates as a surrogate measure of the "time-value" of the money IMC lost. We cannot conclude that the testimony on lost profits lacked a basis in sufficient relevant data merely because there is no evidence that IMC followed a strategy of investing in treasury bills. On this narrow question, we reject Burke's contention.

■ Burke apparently contends that the evidence does not provide reasonably certain proof of lost profits because IMC did not, in fact, post a profit in 1980 or in any subsequent year. In *Restaurant Operators, Inc. v. Jenney*, 128 N.H. 708, 519 A.2d 256 (1986), however, we upheld an award of lost profits even though the injured party's business posted losses every year it operated. The plaintiff in that case presented extensive financial data and uncontradicted testimony that the business had reached the break-even point shortly

before the breach and "gave every prospect of continued growth." *Id.* at 712, 519 A.2d at 260. Kenison provided similar, uncontradicted evidence in this case. We decline to rule that IMC's evidence on lost profits was speculative on this ground.

■ Burke also contends that Kenison's testimony was speculative because it projected lost profits through 1985, three years after Burke had IMC evicted from the job site. Hounsell testified, however, that he never succeeded in ridding the industry of the perception that IMC was responsible for the shortcomings in the Bartlett school project. Curtis Burke, vice-president of the defendant, testified that a contractor's likelihood of placing an acceptable bid on a valuable project is determined in part by its past performance and references. Given this evidence, we are not persuaded that the projection of lost profits in this case constituted speculative proof of lost profits.

In its brief, Burke lists certain factors it contends Kenison should have analyzed, but did not: Burke's full payment to IMC for work completed in 1980; the "particular jobs IMC did" from 1980 through 1985; "the degree of profitability in public works projects"; and the availability of bidding opportunities in particular regions in the State. Burke's brief does not clarify how such factors might have affected Kenison's calculations, but merely asserts that Kenison's failure to take them into account rendered speculative the proof of lost profits.

That Burke listed these factors without elaboration makes extensive consideration of them unnecessary. *See Keenan v. Fearon,* 130 N.H. 494, 499, 543 A.2d 1379, 1382 (1988). We note that Kenison was familiar with the general nature of IMC's work. Kenison compared IMC's performance against growth in the construction business across the State because IMC engaged in a "statewide business." In addition, the availability of bidding opportunities is unlikely to have limited IMC's performance between 1980 and 1985 because the construction industry experienced dramatic growth during that period. We also note that the jury was apprised that Kenison's conclusions might have been weakened by his failure to account for each of these factors. In fact, the jury awarded only $100,000 on the breach of contract claim, although Kenison's lowest estimate was more than twice that amount.

■ Proof of lost profits is not speculative as a matter of law simply because all conceivable factors have not been assessed. A de-

gree of uncertainty is inherent in any projection of future profits, *cf.*
*Van Hooijdonk v. Langley*, 111 N.H. 32, 34, 274 A.2d 798, 799 (1971);
the essential issue is whether the evidence on lost profits provides
enough information under the circumstances to permit the fact
finder to reach a reasonably certain determination of the amount of
gains prevented. *Cf. Fitz v. Coutinho*, 136 N.H. 721, 727–28, 622 A.2d
1220, 1225 (1993). We conclude that Kenison's evaluation of IMC's
financial records constituted an analysis of lost profits based on suffi-
cient relevant data, and that the record contains sufficient evidence
of lost profits to support the fact finder's assessment of damages. We
hold that the trial court did not err in admitting Kenison's testimony
or in denying Burke's motions to void the award of consequential
damages for the breach of contract claim.

## II. Defamation

The next issue is whether the evidence supports the ver-
dict that Burke defamed IMC. To establish defamation, there must
be evidence that a defendant failed to exercise reasonable care in
publishing, without a valid privilege, a false and defamatory state-
ment of fact about the plaintiff to a third party. *See* RESTATEMENT
(SECOND) OF TORTS § 558 (1977); R. MCNAMARA, 8 NEW HAMP-
SHIRE PRACTICE, PERSONAL INJURY, TORT AND INSURANCE PRAC-
TICE § 2 (1988). We will uphold the trial court's decision to allow the
jury to find Burke liable for defamation if the jury's verdict is sup-
ported when the evidence is viewed in a light most favorable to IMC.
*See Petrie-Clemons v. Butterfield*, 122 N.H. at 124, 441 A.2d at 1170.

IMC first contends that the jury's verdict is supported by
evidence that Burke characterized IMC as in "default," thereby sug-
gesting that IMC was either unwilling or unable to perform its du-
ties. We disagree with IMC's contention because there is no evidence
that Burke published the term "default" to any third party. *See* RE-
STATEMENT (SECOND) OF TORTS § 558(b). Although Burke threat-
ened "to default" IMC in a letter to IMC, there is no evidence that
any third party received this communication. In fact, no formal dec-
laration of default ever occurred. Furthermore, the investigator for
IMC's bonding company who testified that he had "heard the word
'default' used" in his interviews stated that he did not interview any
Burke employees. Such evidence does not provide grounds for a rea-
sonable jury to infer that *Burke* actually used the term "default" to
describe IMC in any communication with a third party.

 IMC's alternate theory for supporting the jury's verdict is that its summary discharge from the job site was a slanderous act that communicated to others that IMC had breached its contract with Burke. *See* RESTATEMENT (SECOND) OF TORTS § 568(2); *see generally* Annotation, *Libel or Slander: Defamation by Gestures or Acts*, 46 A.L.R.4th 403 (1986). We disagree. Although the evidence indicates that a general contractor's act of removing a subcontractor from a job site may impair the subcontractor's reputation, we note that a tort does not occur whenever a person's reputation is damaged. Proof of all the elements of defamation is still required. At trial, neither party produced any evidence from which a reasonable jury could have inferred that Burke's conduct was taken by any third party to mean that IMC had breached its contract. *See* RESTATEMENT (SECOND) OF TORTS § 558(a). No persons testified to understanding any information from Burke's discharge of IMC. There is no evidence indicating what statement of fact, if any, other parties gleaned from Burke's act. *See id.* §§ 563, 614(2). Accordingly, IMC's claim of defamation was insupportable, and therefore, we must reverse the jury's verdict on this count.

Because of this holding, we need not address the argument that the jury's award of damages for defamation lacked an adequate basis in the evidence. Furthermore, we need not address the argument that the damages awards were duplicative or manifestly exorbitant when added together. We do not find manifestly exorbitant the jury's award of $100,000 for the breach of contract claim, *see Steel v. Bemis*, 121 N.H. 425, 428, 431 A.2d 113, 116 (1981), given the record in this case. We affirm the verdict and damage award for breach of contract, but reverse the verdict for defamation, and vacate the damages awarded for defamation.

*Affirmed in part; reversed in part; vacated in part.*

All concurred.