Middleton v. Sutton                               CV-92-589-B   03/31/95

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

William Thomas Middleton

    v.                                         No. 92-589-B

Elizabeth Sutton, et al.

**O R D E R**

The plaintiff, William Middleton, alleges defamation[1] by the defendants, Investigative News Group, Inc. and Tribune Entertainment, based on a Geraldo television program. The program was broadcast to a national television audience on September 20, 1990, and included discussion of Middleton's alleged sexual abuse of his children and his participation in the production of child pornography. Pending before me is defendants' motion for summary judgment alleging that Middleton has insufficient evidence to support his claim.

---

[1] Although Middleton also alleged a claim for invasion of privacy, he has waived this claim by failing to respond to defendants' challenge to the claim in their motion for summary judgment. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir.), cert. denied, 494 U.S. 1082 (1990).

## FACTS[2]

Geraldo Rivera and Elizabeth Sutton, Middleton's ex-wife's sister, made the following allegedly defamatory statements during the broadcast of a Geraldo program entitled "Protecting America's Children": (1) Rivera introduced Sutton on the program as "the aunt of two children whose father ran a child porn and molestation ring--it is believed the ring operated in 12 states and four foreign countries." (2) Sutton stated, "One of the children told us that they had been abused and, of course, we had a Department of Human Services' investigation, medical evidence, positive GC[3] cultures on both children." When Rivera asked Sutton for evidence of abuse, she responded, "The positive GC cultures on both children and two other children living in the home" and "Then, of course, it's been validated by the State of Arkansas twice, the State of Georgia once, the medical evidence with the Arkansas Children's Hospital. All the police investigators feel that it's true. Everyone feels that they're

_____

[2] The following facts are either undisputed or, if disputed, reported in the light most favorable to the plaintiff.

[3] "GC" is apparently an abbreviation for "gonorrhea culture."

2

telling the truth."  (3) After conversation between Sutton and Rivera about Middleton's sexual abuse and exploitation of his children and positive gonorrhea cultures on the children, Rivera said, "Is there a crime more violent than what this pig did to his own children? Is there anything that could make us more infuriated? . . . It's rape, but it's worse than rape.  It's re-rape every time some pervert screens the video starring his own children, that's what it is."  (4) Sutton twice described the children participating in the production of child pornography: "The children talk about participating in the production of the raw film."  "According to the children, according to the --- they would produce their own pornography and that they would use the children to hold up the symbols for the film credits before they would show them in front of you."  (5) Sutton said, "According to the arrest reports, he had a whole barrel full of kiddie porn and probably 400 photographs of children that no one can identify at this time, that we can't get anyone to identify."  (6) Sutton said that the children are in hiding because "one is marked for death."  Rivera responded, "I don't want to get into the occult or satanism too deeply, but it would be remiss of me not to ask you what you meant by 'marked for death,' Elizabeth."  Sutton responded, "Simply, he's been marked for death.  That was his

3

role for ever being brought into the world to begin with." When Rivera commented on the difficulty of proving murder in the practice of satanism, Sutton interjected, "It is on film. If you can find the film, it is on the film."

Penny Price investigated and produced "Protecting America's Children" for the defendants. Price initially relied on another television program concerning Middleton that was broadcast by an affiliate station in Little Rock, Arkansas. The producer of that program, Mel Hanks, also provided Price with additional sources of information, and through him she contacted Mark Hampton, an attorney who represented Middleton's ex-wife, and Sutton, who Hanks said had been actively involved in the case. Sutton had gathered extensive documentary information relating to the case, which she provided to Price. Finally, Price interviewed people who were specialists in the field of child abuse and exploitation.

Based on her research, Price invited Hanks, Sutton, Hampton, and two child abuse and exploitation specialists to appear on a Geraldo program titled "Exposing the Exploiters" where they discussed Middleton's alleged sexual abuse and exploitation of his children, including details of ritualistic and satanic

4

activity.[4] In preparing "Protecting America's Children," Price relied on material from the first program, information from the Arkansas program, interviews with Sutton and the materials she provided, interviews with Hampton, and interviews with Carol Pate, an "occult specialist" who had interviewed the Middleton children.

The transcript of the Arkansas program alleges that the state court initially awarded custody of the Middleton children to their maternal grandparents, but later gave custody to Middleton after he denied abusing his children and passed a lie detector test. The program challenged the court's decision to award custody to Middleton based on the following evidence presented during the proceedings: the hospital's gonorrhea test; a psychologist's report which said, "[T]he children suffer both from stress and repeated sexual abuse"; a report from a social service agency, "SCAN," that said that Middleton had an extensive pornography collection; and opinion testimony by an employee of a social service agency that the facts presented in court showed that the children had been sexually abused by their father.

---

[4] Defendants taped this program before a live audience but it was not televised. Middleton has not based his claims on any of the statements made during this program.

Sutton's knowledge of Middleton's actions came from her sister, Middleton's ex-wife. Sutton says that she spoke with Price "on a number of occasions" about the custody dispute between her sister and Middleton, about Middleton's sexual abuse of his children, and about his involvement in a child pornography and molestation ring. She also provided Price with "voluminous court and medical records" that she said documented Middleton's sexual abuse of the children. Price cannot now remember specifically which of these documents she reviewed, but she knows that they included "records by health care professionals who had found that the Middleton children had been sexually abused, as well as records of court proceedings."

Hampton's information concerning Middleton came from his representation of Middleton's ex-wife. Hampton appeared on the first Geraldo show and stated that after the Middleton children received psychiatric counselling and revealed "what their father had been doing to them," custody of the children was returned to their mother. He also said on the show that his information was based on what the children told their mother and their aunt, Sutton, including tales of murder, sexual abuse, and satanic rituals.

Price interviewed Pate before the second program. Pate informed Price that she was an occult specialist who has worked with over 100 police departments and the Federal Bureau of Investigation on criminal cases involving child sexual abuse and molestation. She counselled the Middleton children for several months in 1989 and 1990, and during the counselling sessions, the children told her that Middleton had sexually abused them and had made sexually explicit films of them and other children on a number of occasions. Based on her training and experience as an occult specialist, Pate concluded that the children described incidents of satanic and ritualistic practices including that the boy had been "marked for death" by his father.

Middleton is in prison in Georgia after pleading guilty to two counts of sexual exploitation of children for possession and importation of child pornography. When his house was searched prior to his arrest, officers seized ten magazines, a videotape, catalogs, brochures and order blanks for sexually explicit subject matter, including child pornography. Middleton was not charged with crimes involving child abuse or molestation. Further, the record contains no other evidence suggesting that Middleton ever "ran a child porn and molestation ring."

7

## STANDARD OF REVIEW

Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine" issue is one "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A "material issue" is one that "affect[s] the outcome of the suit . . . ." Id. at 248. The burden is on the moving party to aver the lack of a genuine and material factual issue. Finn v. Consolidated Rail Corp., 782 F.2d 13, 15 (1st Cir. 1986). The court must view the record in the light most favorable to the nonmoving party, according the nonmovant all beneficial inferences discernable from the evidence. Oliver v. Digital Equip. Corp., 846 F.2d 103, 105 (1st Cir. 1988). Despite the favorable standard for the nonmoving party, the court "need not credit purely conclusory allegations, indulge in rank speculation, or draw improbable inferences." National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995). When a motion for summary judgment is properly supported,

the nonmovant may not rely on the pleadings to avoid summary judgment but must set forth specific facts to show a genuine issue for trial.  Lucia v. Prospect St. High Income Portfolio, 36 F.3d 170, 174 (1st Cir. 1994).  A mere scintilla of evidence is not enough to forestall summary judgment because "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249 (citations omitted).  Therefore, to avoid summary judgment when the moving party challenges the nonmoving party's proof of an essential element on which the nonmoving party bears the burden of proof at trial, the nonmoving party must make a sufficient showing to establish a genuine issue requiring resolution at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

Because neither party requested a jury trial, this case is scheduled as a bench trial.  The court may grant summary judgment before a bench trial if the material facts are undisputed and "a trial or hearing would not enhance its ability to decide the issue."  Posadas de Puerto Rico, Inc. v. Radin, 856 F.2d 399, 401 (1st Cir. 1988).

9

## DISCUSSION

The defendants move for summary judgment asserting that Middleton cannot prove an essential element of his claim--that they were at fault in the production and broadcast of the Geraldo program.[5]  For the reasons that follow, I grant defendants' motion.

To prove defamation under the New Hampshire standard,[6] a private individual plaintiff must show that "a defendant failed to exercise reasonable care in publishing, without a valid privilege, a false and defamatory statement of fact about the plaintiff to a third party."[7]  Independent Mechanical Contractors

---

[5]  The defendants also argue that two of Rivera's statements during the program, which Middleton alleges were defamatory, were merely non-actionable opinions rather than statements of fact. See Milkovich v. Lorain Journal Co., 497 U.S. 1, 20-21 (1990); see also Phantom Touring, Inc. v. Affiliated Publications, 953 F.2d 724, 727-28 (1st Cir.), cert. denied, 112 S. Ct. 2942 (1992).  Because I grant defendants' motion on other grounds, I need not address this issue.

[6]  I previously held that New Hampshire defamation law would be used in this case.

[7]  Although the Constitution may require additional protection in other circumstances, a standard of culpability greater than negligence is not constitutionally mandated in cases such as this where the plaintiff is a private individual and "the substance of the defamatory statement 'makes substantial danger to reputation apparent.'"  Gertz v. Robert Welch, Inc., 418 U.S. 323, 348 (1974) (quoting Curtis Publishing Co. v. Butts, 388 U.S.

10

v. Gordon T. Burke & Sons, 138 N.H. 110, 118 (1993); accord Duchesnaye v. Monroe Enters., 125 N.H. 244, 251 (1984). Expert testimony on the standard of care is not required under New Hampshire law to prove negligence in a defamation case. Kassel v. Gannett Co., 875 F.2d 935, 943 (1st Cir. 1989). Instead, defendants' conduct is measured by that of a reasonable person under all the circumstances rather than by a particular professional standard. Id.; Duchesnaye, 125 N.H. at 251.

Construing Middleton's position generously, he contends that he will prove that defendants acted negligently by demonstrating that: (1) defendants knew when they published the statements that Middleton had passed a lie detector test in which he denied sexually assaulting his children; (2) defendants knew or should have known when they published the statements that much of the information supporting the statements was unreliable because it came from witnesses who were closely associated with his ex-wife; and (3) defendants failed to investigate certain leads that, had they been considered, would have caused them not to publish the statements. After carefully considering these claims and the evidence supporting them in the light most favorable to

_____

130, 155 (1967)).

11

Middleton, I grant defendants' motion because I conclude that, even if Middleton's allegations were true, defendants did not act unreasonably.

Before taping, "Protecting America's Children," Price conducted a thorough investigation and discovered substantial evidence that Middleton had sexually abused his children and had involved them in the production of child pornography. She learned from several sources that the children claimed that their father had abused them and had used them in the production of child pornography. She learned that the children had tested positive for gonorrhea, and she discovered that Middleton had been convicted of possessing child pornography. Finally, she learned that qualified persons, such as the children's social workers and Pate, had concluded, after interviewing the children, that Middleton had sexually abused them. In light of this evidence, it was not unreasonable for the defendants to publish the allegedly defamatory statements even though defendants knew both that Middleton had passed a lie detector test in which he denied abusing his children and that some of the allegations against Middleton were being made by persons such as Sutton and Hampton, who arguably were biased against Middleton. Moreover, while it is always possible to say with the benefit of hindsight

12

that Price could have conducted a more thorough investigation, Middleton cannot establish that the investigation was negligently conducted merely by demonstrating that Price failed to learn that he had tested negative for gonorrhea and that an investigator working for the state of Georgia had concluded that Middleton had not abused his children.[8]

In order to avoid summary judgment, Middleton must produce more than a scintilla of evidence of defendants' negligence. See Anderson, 477 U.S. at 252. "Brash conjecture, coupled with earnest hope that something concrete will eventually materialize, is insufficient to block summary judgment." Dow v. United Bhd. of Carpenters & Joiners, 1 F.3d 56, 58 (1st Cir. 1993). Although Middleton has raised a question concerning the truth of the statements about him on the program, he does not dispute what the defendants did to investigate the story nor has he seriously challenged the defendants' reliance on their research and investigation to broadcast the program. Despite Middleton's opinions, denials, and unsupported assertions of fact, he has not countered the vast weight of the evidence indicating that a

---

[8] Middleton has not offered any evidence to support these contentions. However, in analyzing his claims, I assume that he could prove his claims at trial.

reasonable person in the position of the defendants could have relied on the information produced by their investigation.  Thus, even when the evidence is considered in the light most favorable to Middleton, I would not find that he has proved that defendants "failed to exercise reasonable care for the accuracy of the statements."  Duchesnaye, 125 N.H. at 251.  Under these circumstances, it is unnecessary to hold a hearing to resolve plaintiff's defamation claim.  See generally Posadas, 856 F.2d at 401.

## CONCLUSION

For the foregoing reasons defendants' motion for summary judgment (document 39) is granted.

SO ORDERED.

_____
Paul Barbadoro
United States District Judge

March 31, 1995

cc:  William Chapman, Esq.
     Marcia Shein, Esq.
     John Vanacore, Esq.

14