Rockingham
No. 2007-291

JONATHAN MCNEAL & a.

v.

ROBERT M. LEBEL d/b/a RML GENERAL CONTRACTOR & a.

Argued: April 10, 2008
Opinion Issued: July 11, 2008

*Law Office of Joshua L. Gordon*, of Concord (*Joshua L. Gordon* on the brief), and *Bosen & Springer, P.L.L.C.*, of Portsmouth (*Jonathan S. Springer* orally), for the plaintiffs.

*Tower, Crocker & Mullins, P.A.*, of Jaffrey (*Thomas P. Mullins* on the brief and orally), for defendant Robert M. Lebel d/b/a RML General Contractor.

*Gormley & Gormley, P.C.*, of Nashua (*Arthur O. Gormley, III* on the brief and orally), for defendant Pullman Modular Industries, Inc.

HICKS, J. The plaintiffs, Jonathan and Paula McNeal, appeal an order of the Superior Court (*McHugh*, J.) in their action against the defendants, Pullman Modular Industries, Inc. (Pullman) and Robert M. Lebel d/b/a RML General Contractor (Lebel), arising out of the allegedly improper manufacture and/or construction of a modular home. We affirm in part, reverse in part, and remand.

The trial court found or the record supports the following facts. In April 2004, the plaintiffs contracted with Lebel for the construction of a modular home. The eventual contract price was $359,042. The plaintiffs and Lebel decided to purchase the home from Pullman. The home was to be constructed near the plaintiffs' existing home, allowing them to move into the new home and raze the old one upon completion.

Pullman manufactured the home and delivered it to the plaintiffs' property in August 2004. Mr. McNeal and Lebel noticed several problems, most prominently that the plaintiffs had expected different kitchen cabinets, the beam and joists for the attic did not allow for installation of a flat floor, and Pullman did not deliver any of the three sets of stairs it was to supply. Pullman eventually delivered, or built on-site, the stairs that it was responsible for supplying and Lebel built two sets of basement stairs as he had contracted to do. Once built, some of the sets of stairs failed to satisfy the applicable building code.

The terms of the plaintiffs' construction financing required the loan to be paid by September 30, 2004, but the home was not ready for occupancy by that date. In fact, by October 1, each of the parties had become, in the trial court's words, "somewhat disappointed and distrustful of one another."

Lebel informed the plaintiffs that he would not continue construction unless he was assured payment for work done after October 1. He requested that funds be placed in escrow, but the plaintiffs were not willing to do so.

On October 4, 2004, the plaintiffs' attorney sent a letter to Lebel requesting that he prioritize his work to the exterior of the home. Lebel interpreted this letter to amount to his termination, and, as of October 7, 2004, stopped work on the home. The plaintiffs did not obtain a certificate of occupancy for the new home until July 2005.

The plaintiffs sued Lebel for breach of contract, and both defendants for negligence and violation of RSA 205-B:2 (2000) and RSA chapter 358-A (1995 & Supp. 2007). Lebel counterclaimed for amounts due under the contract and for unpaid work performed.

With respect to the common law theories, the court concluded that "none of the parties [is] without fault" and awarded damages as follows:

> [T]he Court awards the plaintiffs a verdict of $9,250.00 against defendant Lebel on their claims of breach of contract and negligence. The Court awards the plaintiffs a verdict of $9,250.00 against Pullman on their claim of negligence. The Court awards Lebel a verdict of $16,500.00 on his counterclaim against the plaintiffs as it finds that they breached their contract with him by not paying him for all the work that he did and by not allowing him to complete his work. Thus the plaintiffs owe Lebel $7,250.00 at present and Pullman owes the plaintiffs $9,250.00 at present.

On reconsideration, the court ruled that the plaintiffs were entitled to credit for $1,978.36 they paid Lebel for a change order, and reduced the damage award to Lebel by that amount. The trial court found that the evidence did not support the claimed statutory violations.

On appeal, the plaintiffs argue that the trial court erred in: (1) ruling that they breached the contract; (2) making certain factual findings; (3) determining damages; (4) ruling that the home contained no "substantial defects" as that phrase is used in RSA 205-B:2; and (5) ruling that neither defendant committed any unfair or deceptive trade practices as contemplated by RSA 358-A:2 (1995). We will uphold the trial court's factual findings and rulings of law unless they lack evidentiary support or constitute a clear error of law. *Barrows v. Boles*, 141 N.H. 382, 389 (1996).

The plaintiffs first challenge the trial court's determinations of contractual liability, asserting that Lebel materially breached and they committed no breach. They contend that Lebel breached the contract by leaving the job prior to completing his work after insisting upon conditions not contemplated in the contract; specifically, the placement of funds in escrow

and assurance of end financing. They further contend that these were material breaches, relieving them of further contractual obligations.

The trial court found that on September 30, 2004, the plaintiffs' construction lender informed Lebel that it "would not be [disbursing] any more monies for the Plaintiff[s'] project because they were [two] months behind in [their] interest payments." The court also ruled that "Lebel performed his work in accordance with the contract until funding was withdrawn by the finance company" and that the plaintiffs' "unwillingness to escrow sufficient funds to enable Lebel to complete the project was unreasonable."

■ We read the court's order as implicitly ruling that the cessation of disbursements under the construction loan was an apparent anticipatory breach or repudiation of the plaintiffs' contractual obligations, entitling Lebel to seek assurance of payment before continuing his performance. "An anticipatory breach of contract occurs when a promising party repudiates his obligations either through words or by voluntarily disabling himself from performing them before the time for performance." *Syncom Indus. v. Wood*, 155 N.H. 73, 83-84 (2007). Interestingly, as we noted in *Syncom*, the action constituting anticipatory breach in both of our leading cases on the subject, *LeTarte v. West Side Development Group, LLC*, 151 N.H. 291 (2004), and *Hoyt v. Horst*, 105 N.H. 380 (1964), was the failure to make payments under the contract. *Id.* at 84.

■ Our cases note that "[i]n instances of anticipatory breach, the non-breaching party has the option to treat the repudiation as an immediate breach and maintain an action at once for the damages." *LeTarte*, 151 N.H. at 294. As other courts have recognized, however, where the actions of the apparently repudiating party are equivocal or uncertain, this option presents the non-breaching party with a dilemma. *See Norcon Power v. Niagara Mohawk Power*, 705 N.E.2d 656, 659 (N.Y. 1998).

> If the promisee regards the apparent repudiation as an anticipatory repudiation, terminates his or her own performance and sues for breach, the promisee is placed in jeopardy of being found to have breached if the court determines that the apparent repudiation was not sufficiently clear and unequivocal to constitute an anticipatory repudiation justifying nonperformance. If, on the other hand, the promisee continues to perform after perceiving an apparent repudiation, and it is subsequently determined that an anticipatory repudiation took place, the promisee may be denied recovery for post-repudiation expenditures because of his or her failure to avoid those expenses as part of a reasonable effort to mitigate damages after the repudiation.

*Id.* (quotation omitted).

In the case of contracts for the sale of goods, Article 2 of the Uniform Commercial Code (UCC) provides a means for dealing with this dilemma by providing a right to demand adequate assurance of due performance "[w]hen reasonable grounds for insecurity arise" and declaring a failure to provide such assurance within a reasonable time to be a repudiation of the contract. *See* RSA 382-A:2-609(1) (1994). This provision of the UCC "has been considered so effective in bridging the doctrinal, exceptional and operational gap related to the doctrine of anticipatory breach that some States have imported the complementary regimen of demand for adequate assurance to common-law categories of contract law, using UCC 2-609 as the synapse." *Norcon Power*, 705 N.E.2d at 660; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 251 (1981).

■ Although a right to demand adequate assurance under general contract law has not previously been recognized in our case law, we conclude that the trial court correctly applied the doctrine here. The comment to section 251 of the RESTATEMENT (SECOND) OF CONTRACTS notes that that section is based upon a principle "closely related to the duty of good faith and fair dealing in the performance of the contract," RESTATEMENT (SECOND) OF CONTRACTS § 251 comment *a* at 277, a duty that has long been an integral component of our common law of contracts, *see Centronics Corp. v. Genicom Corp.*, 132 N.H. 133, 139 (1989).

■ Because the record reveals sufficient grounds for Lebel to seek adequate assurance of future performance, which the plaintiffs did not supply, neither Lebel's request for the escrow of funds, nor his cessation of work pending such assurance was a material breach relieving the plaintiffs of further obligation under the contract. *Cf. Kunian v. Development Corporation of America*, 334 A.2d 427, 433 (Conn. 1973) (where buyer under installment contract for piecemeal delivery of plumbing and heating material fell behind in payment, seller "had 'reasonable grounds for insecurity' and justifiably informed the [buyer] that it would deliver the balance of the material only if payment of the entire contract was guaranteed by the [buyer's] depositing sufficient cash in escrow to pay for the delivered materials"). We accordingly reject the plaintiffs' argument and uphold the trial court's rulings on this issue.

The plaintiffs also challenge a number of the trial court's factual findings, specifically contending that the court erred in finding: (1) that there was no real pressure or firm deadline for the plaintiffs to move into the new house; (2) that the plaintiffs' financing delays created unreasonable deadlines for completing construction; (3) that the plaintiffs' complaint was not with the

the quality of Lebel's work; and (4) that the plaintiffs deliberately waited to get their certificate of occupancy. We examine each challenged finding in turn.

The trial court stated that "[a]lthough the plaintiffs were anxious to get their new home constructed and move in, they were under no time constraints to do so because they could always continue to live in their existing house until the new house was ready." The court then observed that "[i]n hindsight it appears that it was the lack of any real pressure in terms of the plaintiffs not having a firm deadline to move into their new house that allowed the dispute between the parties to go unresolved for far longer than it reasonably should have."

The plaintiffs take issue with this language, arguing that they had a firm deadline of September 30, 2004, to pay off their construction loan. The trial court did not find to the contrary: the court explicitly noted in its order that "[t]he fact that the construction financing would run out on September 30, 2004 meant that there was some pressure on Lebel to have all of his work done by that date." We conclude that the court's background discussion regarding the plaintiffs' ability to remain in their old house indefinitely was not necessary to its legal rulings.

The plaintiffs next challenge the trial court's statement that "[t]he plaintiffs' delay in getting construction financing and ultimately converting that financing to a conventional mortgage created unreasonable deadlines for the completion of the construction that could not be met." They argue that, to the contrary, their construction financing was in place "as of June 1, in plenty of time to manufacture and set the house" and that it was mistakes by Pullman and Lebel that delayed conversion to a conventional mortgage.

The court's statement is not clearly erroneous nor does it appear to have affected the court's legal rulings to the plaintiffs' detriment. The court stated that "[*l*]*argely* because of the difficulty in obtaining construction financing, there was a delay in getting the plaintiffs' home built" (emphasis added), noting that "even though the contract that Lebel had with the plaintiffs was agreed upon in mid April, production did not begin on the plaintiffs' house until mid July." The plaintiffs do not dispute that their construction financing was not available until June 1, a month and a half after their mid-April agreement with Lebel. They assert that Lebel still delayed placing the order with Pullman until July 6, 2004, but we note that the court did not find Lebel blameless with respect to delays on the project. The court's order merely acknowledges that for various reasons, attributable in part to each of the parties, Lebel's time frame for completing the project shrank from five months (May through September) to slightly under two months (early August through September). We find no error.

The plaintiffs also contend that the trial court erred in finding that "[t]heir complaint was never with the quality of [Lebel's] work, just the fact that the construction had not been completed." They assert that the exhibits reveal repeated complaints to Lebel about the quality of his work. They also note that elsewhere in its order, the trial court stated that the plaintiffs "were dissatisfied with his failure to complete the project and with some of his work."

We conclude that the discrepancy on this issue is of no consequence. The challenged statement was made in the context of the court noting that the plaintiffs' end financing came through only a week after Lebel left the property. The court opined that it "ha[d] to wonder as to why the plaintiffs did not invite [Lebel] back to complete the job" when they now had the money to do so and had no complaint with the quality of Lebel's work. The reason the plaintiffs did not invite Lebel back, however, is immaterial.

■ "Only a breach that is sufficiently material and important to justify ending the whole transaction is a total breach that discharges the injured party's duties." *Fitz v. Coutinho*, 136 N.H. 721, 725 (1993). Thus, the plaintiffs' subjective satisfaction, or lack thereof, with Lebel's work is legally irrelevant so long as any flaws in Lebel's performance did not amount to a material breach; absent material breach by Lebel, the plaintiffs were contractually obligated to allow him to finish the job.

■ The trial court found that Lebel performed in accordance with the contract until the construction lender stopped disbursing funds. This finding precludes a ruling that the flaws in Lebel's workmanship, if any, were material breaches of the contract. *Cf. id.* at 724 ("The trial court is in the best position to evaluate the evidence, and we will not reverse a finding on whether a party performed in a substandard manner, unless the finding lacks support in the record."). Accordingly, any finding regarding the plaintiffs' subjective satisfaction with Lebel's work is legally irrelevant, and we find no reversible error.

Finally, the plaintiffs challenge the trial court's finding that their "[w]aiting to obtain a Certificate of Occupancy until July of 2005 appears at least partially to have been calculated" and that they "elected not to get the stairs corrected, which was an item necessary for occupancy, until the following July." The trial court drew an inference from the facts, apparently not challenged, that when the plaintiffs obtained their permanent financing in October, they ordered new kitchen cabinets, an item not necessary for obtaining a certificate of occupancy, yet did not have the stairs repaired until July. We cannot say this inference was impermissible.

■ The plaintiffs also contend that the trial court erred in its calculation of damages. In reviewing damage awards, we view the evidence in the light most favorable to the prevailing party, and will overturn an award only if we find it to be clearly erroneous. *Syncom Indus.*, 155 N.H. at 88. New Hampshire law does not require mathematical certainty in computing damages, but does require an indication that the award of damages was reasonable. *Id.*

The court found that Lebel "is entitled to be paid an additional $16,500.00." The plaintiffs argue that the trial court erred in its calculation of this amount by "conflating the *value* of Mr. Lebel's work with the amount he got *paid* for it." Specifically, the plaintiffs argue that "the court calculated the value of work done was $336,904." They then imply, in a calculation shown in their brief, that the court arrived at the $16,500 figure by subtracting $320,404, the total amount paid to Lebel through September 17 (not including a change order), from $336,904.

The record does not support this contention. Neither the court's original order nor its order on motion for reconsideration calculates the value of work done to be $336,904. Rather, the court accepted Lebel's contention, evidenced in an October 1, 2004 invoice and later breakdown thereof, that at the time he left the project he was owed $16,500 for work completed to date. The court also found that at the time he left the jobsite, Lebel was owed $38,638 under the contract (contract price of $359,042 less the $320,404 paid through September 17, 2004). The court then found that the "fair value of the remaining work [did not] exceed[] $22,138.00," which is the balance left on the contract after paying Lebel for the work completed after September 17, 2004 (*i.e.*, $38,638.00 minus $16,500).

■ We cannot conclude, as argued by the plaintiffs, that the trial court "conflat[ed] the *value* of Mr. Lebel's work with the amount he got *paid* for it." Although Lebel did not complete performance under the contract, and some of his work required correction, the plaintiffs "necessarily receiv[ed] the value of the work as it [was] done, and if any advantage has accrued to [them] therefrom, [are] liable to pay for the benefit received,—the worth to [them] of the partial performance of the contract by the other party." *Danforth v. Freeman*, 69 N.H. 466, 468 (1898); *see also Britton v. Turner*, 6 N.H. 481, 492 (1834) (pronouncing this rule in case of contract for labor). "[T]he measure of the benefit which the owner would receive from a compliance with the contract" is the contract price. *Danforth*, 69 N.H. at 468. Accordingly, "[e]stimating [the home owners'] liability under the contract completely performed at the contract price, the benefit received, for which [they] should pay on the basis of the contract, is conveniently

ascertained by deducting from the contract price the damage occasioned by the builders' failure to perform the contract." *Id.* at 468-69.

■ Although the trial court in this case reversed the order of the calculation, its "method of computation . . . is reasonable and in accordance with the authorities." *Id.* at 470. In other words, having found that "the amount necessary for the plaintiffs to finish or repair" certain incomplete or defective work was $22,138, the court could have subtracted that amount from the contract price to arrive at the $16,500 awarded Lebel. The court then separately assessed Lebel for the costs of correcting the cabinets, stairs and attic ridge beam and subtracted that total of $9,250 from the $16,500 previously awarded to arrive at a net verdict for Lebel of $7,250. While the court could have added the cabinet, stair and ridge beam costs to the rest of the costs of completion and performed a single damage calculation as set forth in *Danforth*, it nevertheless reached the same result and we therefore find no error.

We next address the application of RSA 205-B:2, which requires that no person sell a new prefabricated or presite built home in New Hampshire without a written manufacturer's warranty that provides, *inter alia,* "[t]hat such home is free from any substantial defects in materials or workmanship in the structure, plumbing, heating, and electrical systems and in all appliances and other equipment installed or included in such home by the manufacturer." The plaintiffs argue that the trial court erred in failing to find that various problems they identified are "substantial defects" under the statute, and in thereby failing to award them costs and attorney's fees pursuant to RSA 205-B:4 (2000) (providing any action by buyer to enforce provisions of RSA chapter 205-B "shall allow for the recovery of court costs and reasonable attorney's fees"). In concluding that the evidence did not support the plaintiffs' theory of liability under RSA chapter 205-B, the trial court stated only that "[t]here were no 'substantial defects' in the home as that phrase is used in" RSA 205-B:2. The court provided no further analysis and gave no indication of how it interpreted the phrase "substantial defects" in reaching its conclusion. We note that the trial court did not find the stairs free of defect, and, in fact, awarded $5,000 in damages for necessary repairs. The plaintiffs assert that this issue presents us with a question of statutory interpretation; namely, a determination of what constitutes a "substantial defect[]" under the statute.

"In matters of statutory interpretation, we are the final arbiter of legislative intent as expressed in the words of the statute considered as a whole. We first examine the language of the statute and ascribe the plain and ordinary meanings to the words used." *Portsmouth Country Club v. Town of Greenland,* 152 N.H. 617, 620 (2005) (quotation omitted).

We note that the legislature has not chosen to define the term "substantial defects," unlike legislatures in other states that have done so. *See* Cal. Civ. Code § 1797.1(d) (Deering 2005) (defining, in mobile home warranty statute, "[s]ubstantial defects in materials and workmanship" to mean "defects objectively manifested by broken, ripped, cracked, stained, or missing parts or components, or workmanship resulting in improper function of materials, components, appliances, or systems as installed or manufactured by the contractor, dealer, or manufacturer"); N.C. Gen. Stat. § 143-143.9(14) (2007) (defining "[s]ubstantial defect" in manufactured home warranty statute as "[a]ny substantial deficiency in or damage to materials or workmanship occurring in a manufactured home which has been reasonably maintained and cared for in normal use. The term also means any structural element, utility system or component part of the manufactured home which fails to comply with the Code."); Fla. Stat. ch. 320.822(15) (2007) (providing a nearly identical definition in a statutory warranty of mobile homes and recreational vehicles); Wyo. Stat. Ann. § 35-18-102(a)(i) (2007) (defining "[d]efect" in mobile home warranty statute as "any insufficiency in the performance, construction, components or material of a mobile home that renders the home or any of its parts not fit for the ordinary use for which it was intended or for human habitation"); Colo. Rev. Stat. § 24-32-3302(6) (2007) (providing a similar definition in statute regulating manufactured homes).

WEBSTER'S DICTIONARY defines "substantial," in pertinent part, as "being of moment: important, essential." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2280 (unabridged 2002). It defines "defect" as a "want or absence of something necessary for completeness, perfection, or adequacy in form or function." *Id.* at 591. Accordingly, relying upon the plain meaning of the language used, we conclude that the term "substantial defect[]" encompasses, at a minimum, the absence of something necessary to adequately perform an important or essential function. *See id.* at 591, 2280.

We conclude that the failure to deliver stairs constitutes a "substantial defect[]" under RSA 205-B:2. Putting aside any difficulties the problems with the stairs may have caused in obtaining a certificate of occupancy, the initial lack of stairs connecting the first and second floors would have made it impossible for the occupants to access the second floor, rendering the second floor unusable. It further appears to us that the provision of access to the second floor is an essential function which the stairs are necessary to accomplish. Accordingly, we conclude that no reasonable finder of fact could find other than that Pullman's failure to deliver the stairs for which it was responsible constitutes a "substantial defect[]" under

RSA 205-B:2 and we reverse the court's ruling on this issue with respect to Pullman. As damages have already been awarded for the defective stairs, we remand solely for an award of costs and attorney's fees pursuant to RSA 205-B:4.

The plaintiffs also challenge the trial court's conclusion that the defendants did not engage in unfair or deceptive trade practices in violation of the New Hampshire Consumer Protection Act. *See* RSA ch. 358-A. They contend that Lebel and Pullman "were deceptive in not disclosing problems with the stairs that would cause the house to fail its inspection, and in not disclosing issues with the driveway and building site which may have caused many of the house's problems." They also contend that the defendants engaged in unfair and deceptive trade practices by promising to deliver and complete a reasonably defect-free house in six weeks when "they knew they couldn't, or were at least indifferent as to whether they could."

We agree with the trial court that these acts do not fall within the ambit of the Consumer Protection Act.

> Perhaps the most common application of the unfairness doctrine involves the withholding of material information. A consumer ordinarily protects himself by choosing among alternative products. For his decision to be meaningful, however, it must be based on full and accurate knowledge of the alternatives. Some sellers have undermined this process by either withholding or failing to generate critical data about their products, thus making it difficult or impossible for consumers to make informed comparisons. Here, . . . [the allegedly deceptive] representation[s] [were] separate and distinct from any consumer transaction and did not induce the type of misinformed decision the Consumer Protection Act addresses.

*Gautschi v. Auto Body Discount Center*, 139 N.H. 457, 460 (1995) (quotation and citation omitted). As the trial court concluded, "What is involved here are routine contract and negligence issues." *Cf. State v. Moran*, 151 N.H. 450, 453-54 (2004) (noting that the defendant "did not fail simply to perform his duties under the contract" for installation of siding, but induced a customer to pay him for materials "at a time when he clearly did not intend to perform the work"). "An ordinary breach of contract claim does not present an occasion for the remedies under the Consumer

470

Protection Act." *Barrows*, 141 N.H. at 390. Thus, the trial court correctly found no Consumer Protection Act violation.

*Affirmed in part; reversed in part; and remanded.*

BRODERICK, C.J., and DALIANIS, DUGGAN and GALWAY, JJ., concurred.