## MELROSE HOUSING AUTHORITY *vs*. NEW HAMPSHIRE INSURANCE COMPANY.

Middlesex. March 9, 1987. — May 21, 1987.

Present: GREANEY, C.J., CUTTER, & KASS, JJ.

*Limitations, Statute of. Contract,* Construction contract, Performance and breach.

On appeal by a contractor's surety from a judgment in favor of a municipal housing authority on the authority's claim for breach of a contract for construction of a public housing project, this court, accepting for purposes of its decision the parties' assumption that the so-called discovery rule applied to the claim against the contractor, held nevertheless that the claim was barred by the six-year limitation period for contract actions set forth in G. L. c. 260, § 2, which had expired before the action was commenced, where, despite the findings of a master that the deficiencies in construction were inherently unknowable, it appeared that the deficiencies, which were widespread and debilitating, could have been observed in the exercise of reasonable diligence by the authority's representatives, whom it was entitled to have present on the construction site for visual examination or reasonable spot-checking of the work. [211-216]

CIVIL ACTION commenced in the Superior Court Department on June 9, 1981.

The case was heard by *Thomas R. Morse, Jr., J.*, on a master's report.

*Terrance J. Hamilton (Stephen M. Perry* with him) for the defendant.

*Jerry E. Benezra (Gerald C. J. Cook* with him) for the plaintiff.

GREANEY, C.J. This is an appeal by the defendant from a judgment of the Superior Court entered after adoption of a master's report (facts final). The judgment assessed damages against the defendant in the amount of $1,007,500.36, the apparent cost of repairing and reconstructing part of a housing project for the elderly in Melrose. We reverse the judgment.

The project in question was built by Varrasso Brothers, Inc. (Varrasso), and substantially completed in April, 1971. It was accepted by the architect and the plaintiff and thereafter occupied. Some time in 1978, cracking, buckling, and other failures were discovered in the exterior brick cavity wall of the building. Investigation of the problem by experts retained by the plaintiff led to reconstruction of the wall and other corrective work. The plaintiff commenced this action against the defendant as Varrasso's surety[1] on June 9, 1981, and the case was tried to the master solely on the claim of breach of the construction contract.[2]

The building was designed and built with a cavity wall; that is a wall consisting of an interior structural wall and an exterior nonstructural wall, with an air space in between. A change in the plans and specifications, apparently requested by the plaintiff, altered the face material of the exterior wall from concrete block to brick. The exterior brick wall was attached to the interior concrete wall in the following manner: Wedge inserts were precast into each of the horizontal concrete spandrel beams, thereby becoming integral parts of the load-bearing interior wall. Courses of bricks were laid working up to an interior spandrel beam. Pressure-relieving angle irons were bolted to the inserts in the interior spandrel beam by means of V-bolts (bolts with V-shaped heads) that had been fitted into each wedge. Flashing, as called for by the specifications, was then placed over the angle irons. This process was continued until the roof cant was reached. Despite the change from con-

---

[1] Varrasso was adjudicated a bankrupt in 1974. Although named as a defendant in the action, Varrasso, for all intents and purposes, was out of the litigation. The architect who designed the project was judgment proof and was not made a party to the action. The judgment is against the defendant only, as Varrasso's surety.

[2] Five other claims against the defendant for Varrasso's alleged negligence, breaches of implied warranties, and fraudulent concealment were disposed of by summary judgment for the defendant because they were either barred by the six-year statute of repose contained in G. L. c. 260, § 2B, or precluded on other principles.

crete block to brick, no revision was made in the original working plans and specifications for the installation of the wedges, V-bolts, and angle irons.

The master concluded that "[t]he cracking, buckling and other failures of the exterior brick facade of [the] project were caused by [Varrasso's] improper installation of pressure relieving angle irons and the omission of pressure relieving angle irons where called for and poor workmanship in the masonry sections of the construction." In support of this conclusion, the master found that in the nine areas of the wall that had been opened and investigated: (a) the pressure-relieving angle irons did not extend to the corners of the buildings as required by the original plans; (b) in other cases, the V-bolts which were to hold the angle irons had been improperly installed, that is, "some bolts holding the angles were only finger-tight; some were missing and in one case there was an angle with the bolt on the angle never having been installed"; (c) flashing (which was designed to carry water out of the cavity wall) in several locations had "not [been] extended out to the angle iron and in some locations the flashing was completely missing"; (d) there was poor bonding between the bricks and mortar because the masons had allowed the mortar to stiffen prematurely before applying it; and (e) the masons had improperly used their mortar boards, allowing excess mortar to drop into the wall cavity and plug the weep holes. These deficiencies were characterized by the master as a lack of "[g]ood workmanship." In his view, they also established contract violations.[3]

---

[3] The master's conclusions on the contract violations read as follows:

"The contract between MELROSE AND VARRASSO is dated April 23, 1969 and is in the total amount of $2,239,784. This contract provided, among many other provisions, that VARRASSO install completely pressure relieving angles and wedge inserts; that all masonry should be laid by skilled workmen under constant supervision. The contract also provided that VARRASSO 'shall also be responsible for the accommodation of bearing plates, setting of loose lintels, placements of anchors, bolts, sleeves, inserts, pressure relieving irons and other items occurring in the masonry work. Every precaution shall be taken to minimize future cutting

We pass the question whether the action should be barred by § 7B of the general conditions of the contract, which is entitled "General Guaranty" and which imposes a one-year limitation after final acceptance on claims against the contractor or its surety for defects in the work. Although this provison is alluded to by the master in his report,[4] the defendant has not briefed its possible application. As a result, the issue is deemed waived. Mass.R.A.P. 16(a) (4), 367 Mass. 921 (1975). Except for the general observations in the margin, we also pass the difficult question whether the action should be barred

and patching.' It also provided that 'membrane flashing shall be installed at exterior foundation sills, over all doors, steel lintels, pressure relieving angles, in exterior walls at floor levels, exterior wall spandrels and as indicated on the drawing.' It also provided that VARRASSO 'shall give his personal superintendence to the work or have a competent superintendent, satisfactory to the local Authority and the architect, on the work at all times during the progress, with the authority to act for him.' VARRASSO 'shall also provide an adequate staff for the proper coordination and expediting of his work.'

"As to the requirement that VARRASSO shall give his superintendence to the work or have a competent superintendent satisfactory to the local Authority and the architect, on the work at times during the progress, with authority to act for him and to provide an adequate staff for the proper coordination and expedition of his work, I find that VARRASSO deviated from these provisions of the contract since, if VARRASSO had complied with these provisions, VARRASSO or its agents or employees would have knowledge of the improper installation and failure to install pressure relieving angles. VARRASSO also deviated from these provisions of the contract resulting in the improper installation and lack of installation of the flashing at the pressure relieving angle irons. These conditions were known or should have been known by VARRASSO or its agents at the time the work was done. These conditions were not knowable or made known to [the plaintiff] until on or about September 5, 1978."

[4] The master referred to § 7A of the "General Guaranty," which states that the certificate of completion and final certificate of payment do not constitute acceptance of the work or relieve the contractor, or his surety, from liability for faulty workmanship. It appears, however, that the general implications of § 7A are controlled by the more specific language of § 7B, which limits liability for "any defects in the work," and liability for "any damage," to the one-year period following final completion except in situations "where guarantees or warranties are required by the specifications for periods longer than one year." No such longer guarantees or warranties appear to exist as to the work found to be defective in this case.

by the statute of repose contained in G. L. c. 260, § 2B.[5] We conclude that the claim is barred by the six-year limitations period for contract actions set forth in G. L. c. 260, § 2, which had expired before the action was commenced.[6]

The general rule is that a cause of action for breach of contract accrues at the time of the breach. *Campanella & Cardi Constr. Co.* v. *Commonwealth,* 351 Mass. 184, 185 (1966).

---

[5] The statute of repose is contained in the proviso to G. L. c. 260, § 2B, as in effect prior to April 7, 1985. The statute was amended by St. 1984, c. 484, § 53, effective April 7, 1985.

The statute has been construed by the Supreme Judicial Court to apply only to tort actions and to actions based on implied warranty where the elements of the claim are the same as those of a negligence claim. See *Klein* v. *Catalano,* 386 Mass. 701, 708 (1982); *Anthony's Pier Four, Inc.* v. *Crandall Dry Dock Engineers, Inc.,* 396 Mass. 818, 822-823 (1986). This interpretation is consistent with the literal language of the statute. In the *Anthony's Pier Four* case, it was held that the statute would not bar an action for breach of express warranty. *Ibid.* The defendant reads this case as barring all contract actions unless the contract promises a specific result. We would not tend to read the decision that expansively, and would direct attention to note 10 at 828 of the opinion, where the court reserves the question "whether technical specifications . . . [in a] written contract . . . create express warranties." In this case, the omission of angle irons and flashing would appear to violate the specifications. The other problems described (loose or missing bolts, improperly mixed mortar) involve shoddy work. We have some doubt, however, that the general provisions of the contract which provide for good workmanship and supervision of subcontractors and their employees can convert a tort action that would otherwise be precluded by the statute into a breach of contract action which is outside the purview of the statute. These provisions restate provisions which would be implied anyway, and they impose a duty of reasonable care. The provisions would appear to be commonplace in construction contracts, and reliance upon them to bypass the statute of repose could substantially negate the statute's purpose. This case involves a mix of problems which, to the extent that specifications have been violated, may involve breaches of contract, and, to the extent that more general duties of care have not been observed, may state wrongs which are so similiar to claims of negligence that they should be barred by the statute.

[6] The defense of the statute of limitations contained in G. L. c. 260, § 2, would be available to the defendant as the general contractor's surety. See *United States* v. *Frankini Constr. Co.,* 139 F. Supp. 153, 155 (D. Mass. 1956).

"However, there are situations in which a cause of action in . . . contract . . . which is based on an inherently unknowable wrong may not accrue until the person injured knows or in the exercise of reasonable diligence should know the facts giving rise to the cause of action." *Frank Cooke, Inc.* v. *Hurwitz,* 10 Mass. App. Ct. 99, 106 (1980). This is the so-called discovery rule. The discovery rule in contract actions thus far has been applied to cases of professional malpractice (which can sound in either contract or tort) where an ordinary layperson would not be expected to recognize a professional failure as a breach of the contract. See the discussion of authorities in *Anthony's Pier Four, Inc.* v. *Crandall Dry Dock Engineers, Inc.,* 396 Mass. 818, 824-826 (1986), where the discovery rule was applied to express warranty claims brought against professionals in the marine design and marine engineering fields. The parties in this case, however, have proceeded on the assumption that the discovery rule applies to an owner's claim against a contractor for breach of a construction contract, and the master decided the case on that basis. We accept the case for decision in this posture.

To toll the running of the statute of limitations, it would have to appear that the plaintiff's claim was "inherently unknowable," namely, that the defects by their very nature could not have been discovered through the exercise of reasonable diligence, including careful physical inspection when and where necessary or appropriate. See *Graveline* v. *BayBank Valley Trust Co.,* 19 Mass. App. Ct. 253, 254 (1985). Put another way, it is a "state of 'blameless ignorance' which tolls the statute of limitations." *Gore* v. *Daniel O'Connell's Sons,* 17 Mass. App. Ct. 645, 648 (1984), quoting from *Urie* v. *Thompson,* 337 U.S. 163, 170 (1949). See also *White* v. *Peabody Constr. Co.,* 386 Mass. 121, 130 (1982).

The plaintiff's claim of inherent unknowability rests principally on the fact that the pressure-relieving angle irons, wedge inserts, and flashing were eventually concealed from view during the normal course of construction of the exterior wall, just as the plans and specifications required. The plaintiff's expert

thought this created, as he put it, a "classic hidden defect," [7] which could have been detected only by the mason subcontractor. The master in substance so found, by concluding that the plaintiff had no reason to notice a problem until 1978, when cracks, buckling, and other failures in the wall began to manifest themselves. But on a project of this magnitude, an owner cannot help but be aware that a great deal of work will be permanently obstructed from view in the course of construction. It follows that examination of work which is to be concealed must be done if the integrity of the project is to be safeguarded. In order to protect an owner's interests in this regard, commercial construction contracts of this type provide that the owner's representatives, the architect, the clerk of the works, and their agents and employees in the field have the right to inspect all phases and details of the work before it is covered up. Sloppy workmanship and defective materials can be rejected or ordered to be corrected. The contract in this case contained such provisions, and the additional provision that "[i]f any work be covered up without approval or consent of the [a]rchitect or the [plaintiff], it must, if requested by [either of them] be uncovered at the expense of the [c]ontractor." There are also other broad provisions in the contract, the fair import of which ensures that all the work can be inspected and tested "at any time before final acceptance of the entire work." The plaintiff's interests were to be protected by the architect (and his staff) and the clerk of the works.[8] Each of these possessed the expert

---

[7] The expert testified as follows:

"The loose angles when they were put in, as soon as they were installed on top of the bricks, the flashing was dropped down on top of them hiding the angle and hiding the nuts and bolts if they were missing.

So unless you were there before that instant before the flashing was dropped down on top of the angle up high on this pipe staging, you wouldn't be able to tell if you walked by one minute later if they were tied or if they weren't tied."

[8] There was also present at the site a general superintendent who worked for Varrasso. It appears that this superintendent met regularly with the clerk of the works and the architect. We think this person also had responsibility to oversee the details of the work and to bring to the attention of the plaintiff's representatives the sort of defects involved in this case or to order them corrected himself.

skills necessary to examine the performance of the contractor and the subcontractors. The rights conferred on the plaintiff by the contract (as outlined above) imposed a concomitant duty on those experts to supervise performance of the work closely.

The master found specifically that the conditions as to missing and improperly installed angle irons, wedge inserts, and flashing were "inherently unknowable." The reasoning in his report appears to identify these defects as the major faults in the work and the most likely cause of the wall's incipient failure. These problems were readily discovered when parts of the wall were opened up in 1978. The defects appear to have permeated the entire wall and do not appear to have been isolated phenomena. The complete absence of angle irons extending to the corners where cracking could be anticipated and the fact that wedge inserts and flashing were missing should have been particularly noticeable to the trained eye closely watching work on the wall as it progressed. Indeed, the exercise of special care may have been necessary on this phase of the project since Varrasso was also the masonry subcontractor (and therefore was supervising its own employees), and since it should have been known, in view of the change of the wall's facade and its particular structure, that the complete and proper installation of angle irons, wedge inserts, and flashing was critical to the wall's ultimate stability.

Consistent with their obligations, the clerk of the works was, or should have been, overseeing continuously the details of construction and the architect was, or should have been, performing complete inspections, at least on a weekly basis. We think that the defects, which were widespread and debilitating, could have been observed in the exercise of reasonable diligence by the plaintiff's representatives either by visual examination during construction or by reasonable spot-checking of the work. If these important portions of the work were completed without thorough inspection, then the right to uncover the work should have been exercised. One rationale underlying the discovery rule is that skilled professionals do much of their work out of the client's view. Since the client is usually not an expert, he cannot reasonably be expected to recognize pro-

fessional negligence or contract deviations. As one leading decision has put it, the client "should not be expected to watch over the professional or to retain a second professional to do so." *Hendrickson* v. *Sears,* 365 Mass. 83, 90 (1974). See *Anthony's Pier Four, Inc.* v. *Crandall Dry Dock Engineers, Inc.,* 396 Mass. at 824-825. In this case, however, precisely to avoid the sorts of problems we see here, the plaintiff was protected by its own team of experts who were charged with watching over the work. The experts' express task was to ensure that the plans and specifications and other provisions of the contract requiring competent performance were followed. The experts did not do so.

We do not view ourselves as bound on the issue by the master's findings of inherent unknowability, which bespeak acceptance of testimony by the plaintiff's expert, see note 7, *supra,* and his opinion that the deficiencies would have been known only to the masonry subcontractor. The plaintiff asserts that these are unassailable findings of fact. "Although the question of whether reasonable diligence has been exercised is factually based, . . . the actual determination [of the question] is a sufficiently mixed question of law and fact to permit an appellate court to resolve the issue at least where the action below was tried [to a master]." *Cook* v. *Avien, Inc.,* 573 F.2d 685, 697 (1st Cir. 1978), and cases cited. We also consider the result supportive of the principle, particularly applicable to limitations and repose problems, that a defendant "ought not to be called on to resist a claim 'when evidence has been lost, memories have faded, and witnesses have disappeared.'" *Klein* v. *Catalano,* 386 Mass. 701, 709 (1982), quoting from *Rosenberg* v. *North Bergen,* 61 N.J. 190, 201 (1971). Here, the action was commenced ten years after the project had been completed; by then Varrasso had gone bankrupt, the masonry subcontractor, a Varrasso subsidiary, was probably also defunct, the architect was judgment proof, the clerk of the works had died, and notes and records could not be found.[9] We conclude

---

[9] The fact that construction contracts typically contain their own limitations periods, see note 4, *supra,* and the fact that any such contract may be

that the relevant statute of limitations, G. L. c. 260, § 2, expired before the action was commenced.

The judgment is reversed. A new judgment is to be entered dismissing count 2 of the complaint.

*So ordered.*

---

subject to the general six-year statute of limitations for contract actions contained in G. L. c. 260, § 2 (and the strict applications of the discovery rule in circumstances such as those discussed in this opinion), may explain why the repose provision in G. L. c 260, § 2B, is limited to tort actions (and kindred actions for breaches of implied warranties), as adequate principles exist to confine actions for breach of construction contracts to reasonable periods after the breach.