**KEANE, INC., Plaintiff,**

v.

**Jeffrey B. SWENSON, Defendant.**

**No. Civ.A.98–CV–10877PBS.**

United States District Court, D. Massachusetts.

Jan. 13, 2000.

Peter J. MacDonald, Hale & Dorr, Boston, MA, for Keane, Inc., plaintiff.

Russell X. Pollock, Campbell, Campbell & Edwards, Boston, MA, for Jeffrey B. Swenson, defendant.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### I. *INTRODUCTION*

This declaratory judgment action involves a dispute between Keane, Inc. and its former employee, defendant Jeffrey Swenson, over the terms of a restricted stock plan.[1] Swenson claims he is the

---

**1.** Plaintiff seeks a declaratory judgment pursuant to Mass.Gen.L. ch. 231A that it has complied with its duties and obligations under the employment agreement and restricted plan. Defendant has filed counterclaims asserting breach of contract, specific performance, declaratory judgment and violation of Mass.Gen.L. ch. 93A.

owner of a restricted stock certificate, shares of Class B common stock, and stock dividends. Keane moves for summary judgment, arguing that it complied with the contract provision regarding stock repurchase, and that Swenson's claims are time-barred. After hearing plaintiff's motion for summary judgment is *ALLOWED*.

## II. *FACTUAL BACKGROUND*

The following facts are stated in the light most favorable to the defendant as the non-moving party, and are undisputed unless otherwise noted.

In June 1986, Jeffrey Swenson ("Swenson") entered into an employment agreement with Keane, Inc. ("Keane") after he and Gene Franz ("Franz") sold Keane their interest in Reden Consultants Corp. ("Reden"). As part of the employment agreement (¶ 3.5), Swenson purchased 1,000 shares of Keane common stock for $100 in July 1986 through the 1983 Keane Restricted Stock Plan. The shares were subject to the following relevant restrictions:

5. *Terms and Conditions of Restricted Stock Awards.*

(a) In addition to such terms, conditions and restrictions upon awards as shall be imposed by the Board of Directors,

(1) all shares of Restricted Stock awarded under the Plan shall not be sold, assigned, transferred, pledged, hypothecated or otherwise disposed of for a period of three years from the date of the award; and

(2) the recipient of the award shall remain in the employ of the Company or its subsidiaries for such three year period. . . .

6. *Repurchase by Company.*

(a) In the event that the employee's status as an employee is terminated for any reason within three years from the date of an award the employee . . . shall immediately offer (and in the event that the employee or his estate fails or is unable to do so, shall be deemed to have

so offered) to the Company for purchase by the Company, at a price equal to the price per share paid by the employee for such shares, all of the employee's stock awarded pursuant to this Plan. The Company shall have 90 days following the termination of the employee's employment to accept or reject all or any part of the shares included in the offer to purchase made (or deemed to have been made). . . .

(c) Any shares which the Board of Directors elects to repurchase under this Plan for the account of the Company or the Company's designee shall be tendered to the Company by the delivery of certificates therefor, duly endorsed in blank, at the Company's principal office on the date and at the time specified by the Board of Directors. Payment shall then be promptly made by the Company to the employee.

Subsequently, Keane announced a 3-for-2 stock dividend, and Swenson qualified for an additional 500 shares of Class B common stock on July 21, 1986. Swenson claims that he never received a certificate for the 500 shares, but that he was aware that he had an ownership interest in the additional 500 shares.

Less than a year later, Swenson resigned his position with Keane effective May 15, 1987. Swenson did not immediately offer to sell Keane the 1,000 restricted shares or the 500 shares of Class B common stock for the purchase price of $100, per § 6(a) of the Restricted Stock Plan. Instead, believing that the shares had been part consideration for the purchase of Reden, he asked Keane to pay market value for the shares.

Philip Harkins ("Harkins"), Keane's Vice President and Director of Human Resources, informed Swenson by letter on June 3, 1987 that the company would not honor Swenson's request for market value payment. Swenson and Harkins discussed the matter during a June 25, 1987 telephone conversation. Swenson told Harkins that he wanted Keane to either lift

the restrictions or pay Swenson the market value for the stock. Keane argues that Keane accepted Swenson's "deemed" offer of the restricted stock during this conversation (Plan ¶ 6(a)). Swenson rejects this characterization of the conversation.[2]

Harkins rejected all of Swenson's demands in a letter written at some point between June and August 1987, but neither Swenson nor Harkins has retained a copy of that letter. Harkins remembers telling Swenson many times between May and September that Keane intended to repurchase the stock. Swenson denies this. Swenson reiterated his demands in a letter dated August 19, 1987, asking in pertinent part that Keane release the 1,500 shares of stock and pay him fair market value for those shares. Swenson next received a letter dated September 1, 1987 with a $100 check enclosed from Francis Cleary ("Cleary"), Treasurer of Keane. In the letter, Cleary informed Swenson that the check was payment for repurchase of 1,000 common and 500 Class B common shares, and asked that Swenson return the certificates for both. Swenson stapled the check to the certificate and "threw it in a drawer." He did not tender the shares to Keane, and Keane did not contact him to demand return of the shares. With the exception of one attempt to negotiate a settlement in mid–1988, there was no contact between the two parties.

Swenson learned that Franz had received a 50 share unrestricted stock certificate from Keane as part of an employee retirement profit sharing program in 1989, apparently around the time that Keane issued a 2–for–1 stock dividend on May 8, 1989. Swenson contacted Cleary to ask whether he also should have received a 50 share certificate, and Cleary answered in the affirmative. Cleary also informed Swenson, however, that Swenson could not sell the restricted stock he had retained, and added that Keane would not issue dividends on the restricted shares. Swenson told Cleary that he felt that it was still an open issue, but took no further action. In July 1989, the three year restrictive period for the disputed 1,500 shares elapsed. Keane did not lift the restrictions; nor did Swenson demand that they be lifted.

Keane issued five more stock dividends between 1990 and 1997.[3] In each instance, Swenson received dividends on the 50 unrestricted shares he owned through the employee retirement profit sharing program, but none for the disputed 1,500 restricted shares. Apparently, Keane had placed a stop-transfer on the disputed shares registered to Swenson with the transfer agent, the First National Bank of Boston ("Bank of Boston"). Rather than issue stock certificates to Swenson, each time Keane announced a stock dividend between 1989 and 1993, Bank of Boston

---

**2.** Swenson's testimony concerning Harkins' response varied somewhat over the course of his deposition. *Compare* Swenson Dep. 87–88.

Q: All right. [Keane] was telling you that we want to go by the terms of this ... restricted stock plan, and we'll pay you $100 for the stock. And that was a discussion and communication that took place in the time frame of June of 1987, correct?

A. That's correct.

*with* Swenson Dep. at 77.

Q: And Mr. Harkins made it clear to you, did he not, that Keane wished for you to tender back the restricted stock as part of your departure?

A. I don't recall [Harkins] asking that.

and Swenson Dep. at 84.

Q. And Mr. Harkins was saying to you, no, we don't want to lift any restrictions. We want you to give us the shares back and we'll pay you $100.

A. I don't believe that ... Harkins told me that on the phone. I believe that ... Harkins was more of a conduit for me to share what my issues and concerns were. And his response back to me was in the form of a letter.

**3.** Keane issued the following stock dividends:

| | |
|---|---|
| February 14, 1990 | 3–for–2 |
| August 18, 1993 | 3–for–2 |
| September 8, 1994 | 3–for–2 |
| November 29, 1996 | 2–for–1 |
| August 29, 1997 | 2–for–1 |

mailed the certificates to Cleary, who kept them in a safe in his office. Swenson was not explicitly notified of the stop-transfer action; nor was he told that Cleary held these certificates. In a letter dated September 29, 1993, Keane instructed the Bank of Boston to cancel Swenson's 1,500 shares and return them to the company's treasury stock account in anticipation of the company going to market. By written act of Keane's Board of Directors, the company indemnified Bank of Boston for any liability. Again, Swenson was not explicitly notified that Keane had acted to cancel the 1,500 restricted shares.

On October 3, 1997, Swenson's attorney contacted Keane and demanded that the company lift the restrictions on the 1,500 shares and issue the withheld stock dividends. Keane's refusal prompted this litigation.

## III. *DISCUSSION*

### A. *The Standard*

A motion for summary judgment must be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair,* 902 F.2d 140, 143 (1st Cir.1990). If this is accomplished, the burden then "shifts to the nonmoving party to establish the existence of an issue of fact that could affect the outcome of the litigation and from which a reasonable jury could find for the [nonmoving party]." *Id.* (citations omitted).

The nonmovant cannot rest upon mere allegations. *See id.* Instead, the nonmoving party must adduce specific, provable facts which establish that there is a triable issue. *See id.* Rule 56(e) "requires nonmovants to submit evidence that would be admissible at trial to oppose properly submitted motions for summary judgment." *Federal Deposit Ins. Corp. v. Fonseca,* 795 F.2d 1102, 1110 (1st Cir.1986). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Rogers, supra,* (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

### B. *Breach of Contract*

■ Keane argues that the action is time-barred because it was filed more than six years after the alleged breach of contract occurred. Massachusetts law provides a six-year statute of limitations for contract actions. *See* Mass.Gen.L. ch. 260, § 2. A cause of action for breach of contract generally accrues at the time of the breach. *See Cambridge Plating Co., Inc. v. Napco, Inc.,* 991 F.2d 21, 25 (1st Cir. 1993) (citing *International Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc.,* 29 Mass.App.Ct. 215, 221, 560 N.E.2d 122 (1990)). Swenson argues that the action is timely because Keane's duty to remove the restrictions was not triggered until Swenson asked Keane to lift them in 1997.

■ The key to this dispute is the contract language itself. The restricted stock plan addressed the ramifications of the termination of employment status within three years of the restricted stock award in two ways. First, employees may sell the restricted stock three years after the date of its award only so long as they are still employed. (¶ 5(a)(1)). Second, if the employment is terminated within that three year period, Keane has the right within 90 days following the termination to purchase the shares "at a price equal to the price per share paid by the employee for such shares." (¶ 6(a) and (c)). Swenson argues that he successfully retained his shares after August 15, 1987 because the $100 was offered two weeks too late under the 90-day window. Even if Swenson is

correct that the repurchase was ineffective because of this delay in tender, he still does not prevail because Keane was obligated to lift the restrictions in July 1989. Its failure to lift the restriction was a breach of the restricted stock plan which triggered the running of the statute of limitations. *See Corroon,* 29 Mass.App.Ct. at 222, 560 N.E.2d 122. Swenson did not file suit until 1997, eight years after Keane failed to lift the restrictions, well outside the six year statute of limitations under Mass.Gen.L. ch. 260, § 2.

█ Swenson argues, however, that this is a demand contract because there is no provision which requires Keane to lift the restrictions when the 3 year period expires. Under Swenson's construction of paragraph five, the duty to take affirmative steps to lift the restriction by means of either issuing a registration statement or legal opinion is not automatic but must be prompted by a specific demand from the employee. The problem with this argument is that the plan does not expressly provide such a demand requirement. Even if such a term could be implied, Swenson was on notice in 1987 and again in 1989 that Keane had repudiated the contract. With respect to a contract subject to performance on demand, a party cannot have been said to have breached the contract until that party has clearly and unequivocally repudiated its obligation. *See Barber v. Fox,* 36 Mass.App. Ct. 525, 527, 632 N.E.2d 1246 (1994). Moreover, a cause of action is lost where a party fails to demand performance in a timely way. *Id.* at 528, 632 N.E.2d 1246. In these circumstances, involving a terminated employee with an award of restricted stock, which was a matter of dispute, eight years was too long as a matter of law.

### C. Chapter 93A—Consumer Protection Claim

Massachusetts law provides for a four year statute of limitations for consumer protection claims. *See* Mass.Gen.L. ch.

260, § 5A. The accrual date for a claim under Chapter 93A is determined "by the same principles dispositive of the accrual dates of general tort actions." *Rousseau v. Diemer,* 24 F.Supp.2d 137, 142 (D.Mass. 1998) (quoting *Corroon,* 29 Mass.App.Ct. at 221, 560 N.E.2d 122). "[A] tort cause of action accrues either when the plaintiff is injured as a result of the defendant's unlawful act or omission, or, if the wrong is 'inherently unknowable,' when the plaintiff knows or should have known" of the injury. *Id.* (citing *Pagliuca v. City of Boston,* 35 Mass.App.Ct. 820, 824, 626 N.E.2d 625 (1994)). For the above-stated reasons, Swenson knew he was harmed when Keane stated it would not lift the restrictions in 1989. This claim is time-barred as well.

Invoking the Massachusetts "discovery rule," Swenson argues that the statute of limitations was tolled because he was not present or directly involved in the stop-transfer in 1989 or the cancellation of his shares in 1993. In Massachusetts, the discovery rule may serve to toll the statute of limitations in certain contract claims. (*See Anthony's Pier Four, Inc. v. Crandall Dry Dock Eng'rs., Inc.,* 396 Mass. 818, 824, 489 N.E.2d 172 (1986)).

█ The discovery rule delays the accrual of a cause of action for as long as the facts which give rise to the cause of action are "inherently unknowable," and until such date as the injured party knows or should know of the cause of action. *See The Saenger Org., Inc. v. Nationwide Ins. Licensing Assocs., Inc.,* 119 F.3d 55, 64–65 (1st Cir.1997) (citations omitted). The inherently unknowable facts must be incapable of detection by the wronged party through the exercise of reasonable diligence. *See Corroon,* 29 Mass.App.Ct. at 222, 560 N.E.2d 122 (citing *Melrose Hous. Auth. v. New Hampshire Ins. Co.,* 24 Mass.App.Ct. 207, 212, 507 N.E.2d 787 (1987)).

█ Here, the discovery rule is inapplicable because Keane's intent with respect

to his 1,500 shares was not "inherently unknowable." Swenson was keenly aware of Keane's intent to deprive him of his ownership interest in the shares in 1989, when Cleary explicitly told him that the restrictions would not be lifted, and that the shares could not be sold. Moreover, although he received stock dividends from the shares issued him through the employee profit sharing retirement plan, Swenson never received stock dividends from the disputed 1,500 shares. Swenson failed to make even a minimal effort to pursue an investigation into the status of his 1,500 shares or the dividends. *Cf. Salois v. Dime Savings Bank of New York*, 128 F.3d 20, 27 (1st Cir.1997) (holding that the state doctrine of fraudulent concealment does not excuse a delay in bringing the suit where a plaintiff fails to pursue the investigative opportunities available to him).

### D. *Stock Dividends*

Swenson also claims that, in addition to refusing to remove restrictions on stock, Keane improperly refused to pay him valuable stock dividends on May 8, 1989, February 14, 1990, August 18, 1993, September 8, 1994, November 29, 1996 and August 29, 1997. As this action was filed in 1998, the six year statute of limitations blocks the cause of action for a breach of contract only with respect to the failure to lift the restrictions in 1989 and the issuance of stock dividends in 1989 and 1990. Arguably, while the parties did not press this point, each separate failure to pay stock dividends is a separate breach of contract. Therefore, the Court must address the underlying claim that Keane committed a breach of the Restrictive Stock Plan.

Keane argues that it complied with Section 6(a) by accepting Swenson's deemed offer within the 90–day window. The problem with this position is that there is a disputed issue of fact as to whether Keane actually accepted the "deemed" offer by offering to repurchase during the restrict-

ed stock telephone conversation on June 25, 1987. Swenson submitted sworn testimony that Keane did not make such an offer. Philip Harkins of Keane swears he did. It is undisputed that Keane made an offer to repurchase the stock in a written letter dated September 1. The letter itself states that it "will act as the official notification." Drawing all inferences in favor of the non-moving party, the Court must conclude the offer to purchase was untimely by eighteen days.

Keane argues that Swenson was pursuing a ploy of "gotcha" by deep-sixing the offer in a drawer because it was late. However, perhaps hoping for full vindication on their primary arguments, neither side briefed the issue of materiality. Whether a delay is material depends on all the circumstances of the case. *See Boston Housing Auth. v. Hemingway*, 363 Mass. 184, 200, 293 N.E.2d 831 (1973). The Restatement lists five factors as significant in determining if a failure to render performance is material: (a) the extent to which the injured party will be deprived of the benefits which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform ... will suffer forfeiture; (d) the likelihood that the party failing to perform ... will cure his failure ...; (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing. *See Restatement (Second) of Contracts*, § 241 (1981).

Courts in other jurisdictions have considered whether a delay in performance for similar periods of time constitutes a material breach. *See, e.g., Assoc. Builders, Inc. v. Coggins*, 722 A.2d 1278, 1279 (Me.1999) (holding that a three day delay in payment that causes no detriment or prejudice to obligee is not a material breach); *Frank Felix Associates, Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir.1997) (holding that 20–day delay in

performance is not a material breach when it does not result in detriment to obligee); *Fitz v. Coutinho,* 136 N.H. 721, 622 A.2d 1220, 1223 (1993) (holding that delay in payment schedule of approximately two weeks is not material breach given the prior dealings of parties and finding that adherence to schedule was not essential to contract).

 Based on the factors in the Restatement, I conclude the breach was not material. First, the parties had been discussing actively and in good faith the purchase value of the restricted stock for three months. Even though its "official notification" was late, Keane had made clear its position that it intended to repurchase the stock at the value set by the terms of the Plan. Second, the delay was slight, and there was no evidence of prejudice. Third, the timing of performance was not an essential feature of the contract. *Compare Lease–It, Inc. v. Massachusetts Port Authority,* 33 Mass.App.Ct. 391, 396, 600 N.E.2d 599 (1992) (holding that refusal to pay rental fees for six months is a material breach as fees were essential feature of contract). Neither the Employment Agreement nor the Restricted Stock Plan contains a time-is-of-the-essence provision. *See Davis v. Dawson,* 15 F.Supp.2d 64, 119 (D.Mass.1998) (discussing how time-is-of-the-essence clauses make timing an essential feature of contract absent waiver or other modification). To the contrary, the Employment Agreement, which incorporates the right to restricted stock, provides: "No delay or omission by the company in exercising any right under this Agreement shall operate as a waiver of that or any other right." (¶ 14.1). Accordingly, there was no material breach by Keane which would justify Swenson's nonperformance.[4]

### ORDER

Plaintiff's motion for summary judgment (Docket No. 33) on the defendant's counterclaim is ***ALLOWED.*** The Court orders entry of judgment for the plaintiff.

---

4. Because Swenson has not addressed materiality in its submissions, it may move for reconsideration on this point.