van Gestel, J.
This matter came before the Court on a motion by the defendant, Walsh Construction Company of Illinois (“Walsh”), seeking summary judgment pursuant to Mass.R.Civ.P. Rule 56. The plaintiffs, the Massachusetts Highway Department and the Massachusetts Turnpike Authority (collectively “CA/Tj, oppose the motion.

BACKGROUND

For the purposes of Walsh’s motion, only limited background and procedural facts need be recited.
*16 This is a construction claim arising out of work performed by Walsh on Public Construction Contract C05B1 (the “C05B1 Contract”) for the construction of the Tunnel Finishes between the South Boston and East Boston portals of the Ted Williams Tunnel (the “Tunnel”), as part of the Central Arteiy/Tunnel Project.
The original complaint was filed on December 14, 2001. The currently controlling pleading is the amended complaint, docketed on July 8, 2002.
CA/T charges Walsh with a breach of the C05B1 Contract. At least by June 30, 1997, CA/T was sufficiently aware of the acts of Walsh which it contends constitutes the breach.
There are material facts in dispute as to when, prior to June 30, 1997, Walsh finished its work, or was in a position of substantial completion. There is no dispute, however, that by November 30, 1995, Walsh’s total earned Contract value was 98.2% of the then-current total Contract value, or that the CA/T first opened the Ted Williams Tunnel for public use on December 15, 1995.
The amended complaint, in para. 10, recites that the “Plans and Specifications governing Walsh’s work under the C05B1 Contract imposed a variety of obligations on Walsh, including but not limited to the obligation to construct airtight plenums as part of the exhaust system.”
Certain portions of the Specifications to the C05B1 Contract implicated by the amended complaint read as follows, with all emphasis added:
3.02 INSTALLATION
F. Install panel doors complete with operating hardware and gasket seals as indicated. Adjust hardware for smooth, secure operation and tight airseal
G. Seal perimeter joints as indicated.
H. Remove protective film covering.
2.04 PRECOMPRESSED EXPANDING FOAM SEALANT
A.Provide preformed, precompressed impregnated open-cell foam sealant manufactured from high density polyurethane foam impregnated with a nondrying, water-repellant agent; factory-produced in roll form (precompressed); and in sizes to accurately fit the as-built joint widths when fully expanded in place. Precompressed expanding foam sealant shall be sized to develop a watertight and airtight seal when fully expanded in accord with manufacturer’s recommendations.
3.04 INSTALLATION AND TOOLING SEALANT
D. Install sealant material in uniform, continuous ribbons without gaps or air pockets.
I.06 PANEL TESTING
A.
7. Gasket Tightness Test: Joints of two typical horizontal and vertical panels with gaskets installed as specified, shall be tested for airtightness. A wind load of 55 lbs./sq. ft. shall be applied to the test panels for one hour. Air movement through the panel joints will constitute failure.
2.06 GASKETS AND SEALANTS
A. Provide waterproof airtight gasket closures in the profiles at all panel joints, intersections, and edges. Gaskets shall not be stretched at the time of installation. Provide gaskets in lengths so that gasket joints occur at panel intersections as indicated. Overlap and apply sealant at all gasket joints. All gaskets are to be attached to the panel on one side of the joint by physical clamping or suitable gasket cement.
2.08 General: Provide exhaust duct edge seal as indicated. Include fasteners and other components guaranteed to ensure tight seal of closure.
3.04CEILING PANEL INSTALLATION
B. Install panels and gaskets flush with the fact of adjoining panels. Adhere gaskets and expansion joints as shown and directed in the panel manufacturer’s instructions. Bond longitudinal and transverse gaskets at their intersections with manufacturer supplied bonding compound to provide air-tight joints. Prevent adhesive from soiling exposed panel surfaces and remove excess cement. Remove all visible adhesive in accordance with the panel manufacturer’s recommendation.
C. Install exhaust duct edge seal at cove as indicated.
D. Install continuous metal channel in light trough as indicated. Cantilever lengths of channel not to exceed 2 feet. Provide 1/8" gap between adjacent channels.
Para. 13 of the amended complaint alleges that the air exhaust system in the tunnel was found to be underperforming during the testing conducted in October 1996. Additional investigations and analysis of the underperforming air exhaust system completed in 1997 revealed further latent defects in Walsh’s work. These defects were separate and distinct from the work previously identified in Contract Modification number 103. These defects and variations from the specifications include the following:
a. openings, leakage paths and other defects in closure panels, at several locations along the Project;
b. failure to seal certain ceiling interfaces;
c. failure to install certain wall ceiling interfaces;
d. gaps between duct walls and ceilings;
e. construction of certain panel walls using “sheet metal” rather than double wall panels called for in the specifications;
*17 f. failure to install certain edge seals at several locations;
g. failure to seal closure panels;
h. gaps in the duct wall separations.
CA/Ts amended complaint asserts that Count I sets forth a claim for breach of contract.
Count II of the amended complaint seeks indemnification pursuant to the C05B1 Contract, Section 7.25. This section reads in its entirety:
The Contractor [Walsh] shall indemnify and hold harmless the Commonwealth, the Department, the SDC(s), the AGC(s) and the Management Consultant and the Authorized Representative against any and all legal liability which any of the above-named parties may sustain, incur or be required to pay, including attorneys fees, arising out of or in connection with the Work by reason of any action or inaction of the Contractor, agent(s) or person(s) employed by the Contractor, or any of its Subcontractors; provided that the Contractor is afforded an opportunity to participate in the defense of such claim. In such event, the Contractor shall have the right to disapprove any negotiated settlement. In any event, the Contractor reserves its right to final settlement through the courts of appropriate jurisdiction.
DISCUSSION
Summary judgment is granted where there are no issues of genuine material fact, and the moving party is entitled to judgment as a matter of law. Hakim v. Massachusetts Insurers’ Insolvency Fund, 424 Mass. 275, 281 (1997); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving party, here Walsh, bears the burden of affirmatively demonstrating that there is no triable issue of fact. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989).
The legal issue upon which Walsh predicates its motion is the statute of limitations or statute of repose. Walsh relied upon G.L.c. 260, sec. 2B. CA/T argues that G.L.c. 260, sec. 2 is controlling.
G.L.c. 260, sec. 2, reads:
Actions of contract, other than those to recover for personal injuries, founded upon contracts or liabilities, express or implied, except actions limited by sections one or actions upon judgments or decrees of courts of record of the United States or of this or any other state of the United States, shall, except as otherwise provided, be commenced only within six years next after the cause of action accrues.
As noted above, there are material facts in dispute as to when the cause of action accrued, aside from the knowledge of the acts that form the cause of action were known by the CA/T at least by June 30, 1997.
G.L.c. 260, sec. 2B, reads in material part:
Actions of tort for damages arising out of any deficiency or neglect in the . . . construction ... of an improvement to real property of a public agency, as defined in said section thirty-nine A shall be commenced only within three years next after the cause of action accrues; provided, however, that in no event shall actions be commenced more than six years after the earlier of the dates of: (1) official acceptance of the property by the public agency; (2) the opening of the real property to public use; (3) the acceptance by the contractor of a final estimate prepared by the public agency pursuant to chapter thirty, section thirty-nine G; or (4) substantial completion of the work and the taking of possession for occupancy by the awarding authority.
Because of the factual disputes, the only part of G.L.c. 260, sec. 2B that could apply at this time is the three-year limitations period starting “next after the cause of action accrues.” Again, as noted above, the acts that form the cause of action were known by the CA/T at least by June 30, 1997.
Elementary rules of statutory construction require [Courts] to look to the statutory language itself as the principal source of insight into the legislative purposes ... [A court must] construe the words of the statute according to their usual and natural meaning.
Klein v. Catalano, 386 Mass. 701, 705 (1982).
G.L.c. 260, 2B applies, by its language, to “[a]ctions of tort for damages arising out of and deficiency or neglect in the ... construction ... of an improvement to real property.” Thus, what must be determined here is whether the amended complaint asserts an action for breach of contract or a claim in tort for damages arising out of Walsh’s construction of a portion of the Ted Williams Tunnel.
In the evolution of G.L.c. 260, sec. 2B, there are many cases that have struggled with the issue of whether a certain construction claim is grounded in contract or tort. Four cases, in particular, stand out as defining the role of a Court in making the correct determination. In chronological order, they are: Klein v. Catalano (“Klein”), cited above; Anthony’s Pier Four, Inc. v. Crandall Dry Dock Engineers, Inc. (“Anthony’s”), 396 Mass. 818 (1986); Melrose Housing Authority v. New Hampshire Ins. Co., 24 Mass.App.Ct. 207 (1987) (“Melrose Housing”); and Kingston Housing Authority v. Sandonato & Bogue, Inc., 31 Mass.App.Ct. 270 (1991) (“Kingston Housing”).
Counsel for CA/T began his oral argument by quoting, this Court believes, from the late Cardinal Cush-ing: “When I see a bird that walks like a duck and swims like a duck and quacks like a duck, I call that bird a duck.” See Respectfully Quoted, Congressional Quarterly, Inc. (1992), Sec. 1278. Assaying the four noted cases, what kind of bird is before the Court in the amended complaint?
*18 Klein, 386 Mass. at 702, fn.3, states that “G.L.c. 260, sec. 2B [has as its] effect ... to abolish or abrogate a remedy in tort if the person is injured more than six years after the defendant’s performance or furnishing the design, planning, construction, or general administration of an improvement to real estate.”
Later in Klein, at pp. 708-09, the SJC says:
General Laws c. 260, sec. 2B, was enacted in response to case law abolishing the rule that once an architect or builder had completed his work and it had been accepted by the owner, absent privily with the owner, there was no liability as a matter of law . . . These cases greatly increased the liability of architects, contractors and others involved in the construction industry. “The architect or contractor was confronted not only with an unlimited class of potential claimants, but also, in many instances, with an extension in duration of the liability for negligence.” . . . An injury could occur many years after the architect or contractor had completed his work. Since an ordinary statute of limitations did not begin to run until either the date of the injury or its discovery, those involved in construction were subject to possible liability throughout their professional lives and into retirement. At the urging of those involved in the construction industry, the Legislature placed an absolute limit on the duration of this liability.
At stake in Klein was personal injury to an individual allegedly arising out of claimed negligence and breach of express and implied warranties by a firm of architects in the design of a door at the “Tech Coop” building at M.I.T. The SJC concluded that the implied warranty claim was essentially the same as the negligence claim and, therefore, both were barred by c. 260, sec. 2B. The court also noted at p. 719, however,
that an architect may provide an express warranty of a certain result. In that event, the plaintiff may maintain an action for breach of express warranty ... But, in this case, the architect did not expressly guarantee a specific result. When a party binds himself by contract to do a work or perform a service, he agrees by implication to do a workmanlike job and to use reasonable and appropriate care and skill in doing it . . . Thus, the defendants provided only an implied warranty that they would exercise the standard of care required of their profession. In this circumstance, G.L.c. 260, sec. 2B bars all the plaintiffs warranty claims.
This Court reads Klein as limiting c. 260, sec. 2B to torts claims, and implied warranty claims that are essentially the same, but not to express warranties of the nature found in many contracts or to contracts themselves.
Klein was followed by Anthony’s. In Anthony’s the suit, again, was for negligence and breach of express and implied warranties brought by the owner of a ship turned into a cocktail lounge which was lost in the “Blizzard of ‘78" when it broke loose from a specially constructed mooring and capsized. One of the defendants was the designer of the mooring system. G.L.c. 260, sec. 2B was raised as a defense. The SJC concluded that sec. 2B was a bar to all counts against the designer of the mooring system ’’except the one alleging breach of express warranties in the design of the mooring system." Anthony’s, 396 Mass. at 828.
Once again, the SJC drew a distinction between tort claims, and implied warranty claims like them, and express warranties in the agreement involving what the designer agreed to design with regard to the mooring system.
Melrose Housing was a claim by an owner alleging breach of contract for the construction of a housing project. The defendant was the contractor’s surety. Eight years elapsed between the completion of construction and the first signs of defective work. Citing to Klein and Anthony’s, the Appeals Court made the following comments, at p. 211, footnote 5.
The statute [G.L.c. 260, sec. 2B] has been construed by the Supreme Judicial Court to apply only to tort actions and to actions based on implied warranty where the elements of the claim are the same as those of a negligence claim . . . This interpretation is consistent with the literal language of the statute. In the Anthony’s Pier Four case, it was held that the statute would not bar an action for breach of express warranty... The defendant reads this case as barring all contract actions unless the contract promises a specific result. We would not tend to read the decision that expansively, and would direct attention to note 10 at 828 of the opinion, where the Court reserves the question “whether technical specifications ... [in a] written contract . . . create express warranties.” In this case, the omission of angle irons and flashing would appear to violate the specifications . . . This case involves a mix of problems which to the extent that specifications have been violated, may involve breaches of contract, and, to the extent that more general duties of care have not been observed, may state wrongs which are so similar to claims of negligence that they should be barred by the statute.
In this footnote, the Appeals Court, following Klein and Anthony’s, phrased the issue. Were specifications violated in a way that constitutes a breach of contract or were general duties of care not observed which are similar to claims of negligence? A Court must consider whether it needs to look to a contract or to the obligation implied by law to determine whether, for c. 260, sec. 2B purposes, it is dealing with a contract claim or a tort claim.
Interestingly, Judge Kass, who sat on the Appeals Court panel that decided Melrose Housing, and did not dissent therefrom, authored the Appeals Court’s opinion in Kingston Housing. In Kingston Housing the suit *19 was against a general contractor for failure to follow contract specifications in building an apartment complex. Judge Kass began his opinion with a nod to Melrose Housing, suggesting that “much of what the Kingston Housing Authority . . . has strenuously argued on its appeal is governed by” Melrose Housing. Then, at p. 273 of 31 Mass.App.Ct., Judge Kass said: “(T]he act of unintentionally failing to conform with contract specifications is not different from negligent workmanship.” In so doing, and with due respect, he muddied the waters for trial judges. But later, at p. 274, he remarked, in a manner wholly consistent with Klein, Anthony's and Melrose Housing, “One may imagine, for example, an express warranty in a contract . . ., or a good faith deviation from specifications . . . That is not, however, what has been alleged in this case.” Judge Kass’s analysis then shifted to the major issue in the case, whether there was a contract under seal providing a 20-year statute of limitations.
This Court does not read Kingston Housing as expanding or changing in any way the law as expressed in Klein, Anthony’s or Melrose Housing.
Here, with regard to the first count of the amended complaint, this Court reads the documents that make up Contract C05B1 as requiring Walsh to construct an airtight plenum in the Ted Williams Tunnel. And it reads the amended complaint as alleging Walsh’s failure to do so. It requires no extensive citation to decisions to conclude that this complaint is, thereby, asserting a breach of contract to which G.L.c. 260, sec. 2B does not apply.
The Court views the second count of the amended complaint, asserting indemnification pursuant to C05B1 Contract, Section 7.25, differently. Section 7.25 relates to “any and all legal liability which [CA/T] may sustain, incur or be required to pay, including attorneys fees, arising out of or in connection with the Work by reason of any action or inaction of [Walsh], or its agent(s) or person(s) employed by [Walsh].” What is provided for by this section is protection for CA/T, and others, from claims by third parties, not relief from breaches of Contract C05B1.
ORDER
For the foregoing reasons, the defendant Walsh’s motion for summary judgment is DENIED as to Count I, the plaintiffs’ claim for breach of contract; and ALLOWED as to Count II, the plaintiffs claim for indemnification.